**In Re: Larry Max GRIFFITHS, Coralee (NMN) Griffiths d/b/a Coralar Farms f/d/b/a MGCB Packing Co., Ltd., Debtors.**

**Bankruptcy No. 82–40737.**

United States Bankruptcy Court, D. Kansas.

March 2, 1983.

John H. Stauffer, Jr. of Colmery, McClure, Funk, Letourneau & Entz, Topeka, Kan., for debtors.

Jan M. Hamilton of Hamilton, Peterson, Tipton & Muxlow, Topeka, Kan., for creditor, Union State Bank.

## MEMORANDUM OF DECISION

JAMES A. PUSATERI, Bankruptcy Judge.

In this chapter 11 proceeding, the parties have asked the Court, in a declaratory action, to determine if 11 U.S.C. § 1129(b)(2)(A)(iii) allows the debtors to cram down their plan of reorganization when an electing secured creditor intends to vote to reject the plan.

The issues presented for determination are:

1. If a recourse, undersecured creditor, in its own class, has made an election under 11 U.S.C. § 1111(b)(2), and rejects the debtor's plan of reorganization, is the creditor receiving the "indubitable equivalent" of its claim, under 11 U.S.C. § 1129(b)(2)(A)(iii) when the debtors propose to surrender to the creditor a portion of the collateral, and pay the creditor a lump sum equal to the highest value of the collateral retained by the debtor.

2. Is the creditor equitably estopped from opposing the proposed treatment.

The parties have submitted briefs and the Court is ready to rule.

## FINDINGS OF FACT

The debtors are farmers and filed a chapter 11 petition in bankruptcy on August 6, 1982.

The creditor, Union State Bank (USB), has a security interest in personal property of the debtors including machinery, equipment, livestock and stored grain. USB filed an "election" under 11 U.S.C. § 1111(b)(2) in September, 1982.

The debtors intend to treat USB in the plan as follows:

The debtors will return a portion of USB's collateral and pay a lump sum equal to the value of the remaining collateral in total satisfaction of USB's claim. As the disclosure statement indicates:

> It is debtors position that this combination of property turnover and payment in lump sum of the fair market value of said property is the "indubitable equivalent" of the creditor's allowed secured claim. This treatment will effectively satisfy Union State Bank's claim and no further payments are contemplated under the Plan.

(First Amended Disclosure Statement, pg. 20).

USB has filed a claim in the amount of $570,670.94. (There appears to be an error on the claim and USB may have intended to file a claim in the amount of $574,670.94. The Court will use the lower figure for the purposes of this opinion.) The total value of the security pledged to USB is less than the amount of the debt and thus, USB is "undersecured."

The debtors also allege the following facts in their reply memorandum which the Court accepts as correct for the purpose of this opinion:

> On November 1, 1982, Debtors turned over their commercial cowherd to USB. On November 23, 1982, an adequate protection order was entered whereby Debtors were to pay U.S.B. $500.00 per month for the depreciation to the personal property being retained by Debtors. On December 8, 1982, Debtors turned over to U.S.B. and to Massey Ferguson, certain machinery and equipment and subsequently turned over the Registered Cowherd owned by Debtors. On that date, U.S.B. accepted the payment of $2,000.00, the fair market value of two cows, and Debtors retained two registered cows which are being used in rebuilding Debtors' herd and in the reorganization efforts. Debtors have determined that the personal property still in their possession in which U.S.B. claims an interest, will be beneficial to the rehabilitative efforts they are undergoing and to their Plan of Reorganization. Debtors subsequently proposed to pay U.S.B. more than they would receive if Debtors were to turn over the property. On the notification of U.S.B. that it would not accept such a proposal, its Motion and this Response ensued.

## CONCLUSIONS OF LAW

Section 1111(b)(2) states:

> If ... an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed.

11 U.S.C. § 1111(b)(2). An undersecured creditor, a creditor whose security is worth less than the total amount owed to the creditor, may choose to have its claim treated in two manners. First, it can have a bifurcated claim, with a secured claim to the extent of the value of the collateral, and an unsecured claim for the remainder of the debt owed. 11 U.S.C. § 506(a). Second, the secured creditor can waive its unsecured claim and elect to have its total claim treated as secured. 11 U.S.C. § 1111(b)(2); Klee, All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code, 53 Am.Bankr.L.J. 133, 153 (1979).

There are two situations in which the election cannot be made. First, if the creditor's interest in the collateral "is of inconsequential value ...," the election cannot be made. 11 U.S.C. § 1111(b)(1)(B)(i). Second, if the creditor has recourse against the debtor, such as under K.S.A. § 84-9-504(2) (Supp.1981), and the debtor intends to sell the collateral, such as under 11 U.S.C. § 363(k), the election cannot be made. In the instant case, the collateral has significant value, no sale

is in the offing, and therefore the election is not prohibited.

USB is in a class of its own and intends to reject the debtors' plan. The parties agree USB's claim is being impaired. Thus, in order to confirm the plan the debtors will have to seek a cram down on USB. 11 U.S.C. § 1129(b)(1). There are three alternatives to cramming down a class of secured claims. Although not applicable herein, property can be sold, a lien granted on the sale proceeds, and the lien satisfied under one of the remaining two cram down alternatives. 11 U.S.C. § 1129(b)(2)(A)(ii). There can be a cash payment cram down, requiring the debtor to make cash payments of at least the allowed amount of the claim, and the discounted value of these payments must equal at least the value of the collateral. 11 U.S.C. § 1129(b)(2)(A)(i)(II). The debtor does not propose to cram down under this provision.

The debtors choose the third option of giving USB "the indubitable equivalent of such claim . . . ." 11 U.S.C. § 1129 (b)(2)(A)(iii). The phrase "indubitable equivalent" is derived from Judge Learned Hand's opinion in In Re Murel Holding Corp., 75 F.2d 941 (2nd Cir.1935). It includes "abandonment of the collateral" to the secured creditor. 124 Cong.Rec. H 11,104 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards); 124 Cong.Rec. S 17,421 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini). Indubitable equivalent cash payments must equal at least the secured claim. Payments less than the secured claim are not the indubitable equivalent of the secured claim. Id.

The Court believes there are several reasons the debtors cannot return a portion of the collateral and pay the value of the remaining collateral as the indubitable equivalent of USB's section 1111(b)(2) claim.

First, USB's post-election secured claim is the total amount owed to it, $570,670.94, reduced by the value of any property returned. The debtors must pay the indubitable equivalent of the remaining amount owed, and not simply the indubitable equivalent of the value of the remaining property. The indubitable equivalent of the claim must be realized. The post-election claim is something more than the value of the remaining property.

Second, often a creditor will not elect under § 1111(b)(2) because it will

be reluctant to give up the distribution to unsecured creditors under the plan in exchange for a lien for the full amount of their secured and unsecured claims. . . . The election to relinquish an unsecured recourse deficiency claim for a larger secured claim will normally be used to prevent a "cash out." Absent the election, a plan could free the collateral by paying the secured creditor the value of the collateral as this would not "impair" the secured creditor.

3 Norton, Bankruptcy Law and Practice § 57.02 at 14–15 (Supp.1982). Thus, creditors may choose to elect in cases where the debtor's plan proposes a minimal or zero payment to unsecured claims. In such a plan, the debtor is proposing to "cash out" the secured creditor by paying the value of the collateral. As Judge Norton indicated, § 1111(b)(2) allows the creditor to decide if it will be cashed out for the value of the collateral. The creditor elects to "prevent a 'cash out.'" See 5 Collier on Bankruptcy ¶ 1111.02[5], at 1111–27 (15th Ed.1982). In the instant case, the debtor is essentially proposing to "cash out" USB for the value of the remaining collateral. Section 1111(b)(2) gives USB the ability to prevent the cash out. The Court cannot agree that a cash out payment is the indubitable equivalent of a post election claim that prevented a cash out.

Third, under § 1129(b)(2)(A)(i)(II), payments to the dissenting electing creditor must pass two tests. Under the first test, the total payments must be at least the total allowed claim. When the election has been made, the total amount owed is the allowed claim. Under the second test, those payments must have a present value equal to the value of the collateral. In the instant case, the debtors do not propose to

pay the total remaining allowed claim of USB (after credit for returned collateral), but rather only propose to pay the value of the collateral. Thus, under § 1129(b)(2)(A)(i)(II), the first requirement of cash payment cram down would not be satisfied. The Court does not believe § 1129(b)(2)(A)(iii) was intended as an alternative to the cash payment requirements of § 1129(b)(2)(A)(i)(II).

As Collier states:

> On the one hand, section 1111(b), taken in conjunction wth section 1124 and 1129, gives the debtor the power to retain encumbered property essential to the debtor's reorganization and to obtain confirmation of its plan in the face of opposition by a class of creditors whose claims are secured by such property. This preserves the debtor's ability to reorganize.

5 Collier on Bankruptcy ¶ 1111.02[1], at 1111–14 to –15 (15th Ed. 1982). Although a debtor could return all the collateral in satisfaction of the claim, most often,

> the debtor may well want to retain possession of the property particularly if it is essential to the continued operation of the debtor's business. If the plan proposes that the debtor retain the collateral, the plan will have to comply with section 1129(b)(2)(A)(i). . . .

5 Collier on Bankruptcy ¶ 1111.02[5], at 1111–30 (15th Ed.1982). If all the collateral is not returned, indubitable equivalent in the form proposed by the instant debtors is not available. Id. "Nothing less than the value assured to an electing creditor by section 1129(b)(2)(A)(i) . . . could be crammed down as an "indubitable equivalent." Stein, Section 1111(b): Providing Undersecured Creditors with Postconfirmation Appreciation in the Value of the Collateral, 56 Am.Bankr.L.J. 195, 210 (1982).

Finally, the debtors point out that they could return all the collateral in satisfaction of the post election secured claim. USB agrees. The Court agrees. The debtors argue that there is equitably no difference between returning collateral that could be sold by USB for $x, or just giving USB $x. The argument is alluring, but it has the effect of shifting the power granted under § 1111(b)(2) from the creditor to the debtor. Section 1111(b)(2) gives the creditor the power to decide how it will be treated, and an ability to seek greater payments under a plan calling for zero percent payments· to unsecured creditors. Under the debtors' argument, in a cash out plan, the power is always shifted back to the debtor. A debtor could propose zero payments to unsecured creditors under a cash out plan paying nothing to undersecured creditors. If the creditor elects to prevent cash out, the debtor could return anywhere from a small amount of property to a substantial amount of property and pay the value of the remaining property as the indubitable equivalent of returning all the property. The creditor would still be cashed out by receiving only the value of the collateral, and would be powerless to prevent the cash out. Congress intended that § 1111(b)(2) would give the creditor power to prevent cash out. See 5 Collier on Bankruptcy ¶ 1111.02[1] (15th Ed. 1982). A lump sum cash out payment, that removes the impaired electing creditor's power to prevent cash out is not the indubitable equivalent of the electing creditor's claim.

Therefore, the Court holds that the debtors' proposal will not satisfy the provisions of 11 U.S.C. § 1129(b)(2)(A)(iii).

The debtors also argue that USB is equitably estopped from opposing the proposed treatment. The way USB would oppose the treatment under the plan is, of course, to vote not to accept the plan. At that point, the Court, not USB, must determine if the plan can be crammed down under § 1129(b)(2)(A). The Court is not aware, and the debtors do not argue that USB would be estopped from voting on the plan. In fact, 11 U.S.C. § 1126(a) allows impaired holders of claims to vote and does not mention a situation in which a creditor would lose its right to vote. Furthermore, equitable estoppel prohibits an assertion of rights inconsistent with past conduct if the result would be unconscionable, see, e.g., *Harrin v. Brown Realty Co.*, 226 Kan. 453, 459, 602 P.2d 79 (1979), and if there was

affirmative inducement. *Coffey v. Stephens*, 3 Kan.App.2d 596, 599, 599 P.2d 310 (1979). The Court does not believe USB's election, rejection and opposition to treatment under § 1129(b)(2)(A)(iii) is inconsistent with the acceptance of some collateral in satisfaction of some of the debt. USB is merely utilizing the leverage granted to creditors by Congress. USB does not appear opposed to the surrender of all the collateral by the debtor. Thus, the acceptance of some collateral is not inconsistent with a desire that the debtor either surrender all the collateral or make cash payments under § 1129(b)(2)(A)(i). Moreover, there is nothing inequitable or unconscionable in USB's actions and the Court sees no inducement. The debtors' estoppel argument is therefore rejected.

In summary, the Court holds the debtors' proposal will not satisfy the provisions of § 1129(b)(2)(A)(iii), and the debtors are given 15 days to modify the plan.

The foregoing constitutes Findings of Fact and Conclusions of Law under Bankruptcy Rule 752 and Rule 52(a) of the Federal Rules of Civil Procedure.