**In re 266 WASHINGTON ASSOCIATES, Debtor.**

**Bankruptcy No. 191–16153–353.**

United States Bankruptcy Court, E.D. New York.

June 5, 1992.

Rosenman & Colin by Stephen L. Ratner, Shalom Jacob, New York City, for Citibank, N.A.

Haythe & Curley by Michael V. Blumenthal, New York City, for General Partners.

Harry Greenbaum, New York City, for debtor.

DECISION ON MOTION TO LIFT
AUTOMATIC STAY AND RE-
LATED CONSEQUENCES

JEROME FELLER, Bankruptcy Judge.

Before the Court in this single asset Chapter 11 real estate case is a motion by Citibank, N.A. ("Citibank") for relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) for cause, including an absence of good faith in the filing of the Chapter 11 petition, and 11 U.S.C. § 362(d)(2). On January 23, February 6, and February 26, 1992, the Court conducted hearings at which it heard arguments of counsel and testimony from various witnesses, received documents in support of, and in opposition to, the lift stay motion of Citibank. Post-hearing submissions were filed on behalf of both Citibank and the Debtor on March 26, 1992 and April 6, 1992. Meanwhile, the Debtor pressed forward with the scheduling of a hearing on its first amended disclosure statement. A hearing was held and concluded on May 14, 1992, and the Court reserved decision on the Debtor's first amended disclosure statement.

Upon review, consideration, and analysis of the record, all papers submitted by both sides, and applicable law, we conclude that the Debtor's opposition to termination of the automatic stay cannot be sustained and Citibank's lift stay motion is granted under 11 U.S.C. § 362(d)(2). Having concluded that the lift stay motion must be granted pursuant to 11 U.S.C. § 362(d)(2), we deem it unnecessary and decline to address Citibank's asserted predicates for relief bottomed on 11 U.S.C. § 362(d)(1), including the alleged absence of good faith in the filing of the Debtor's Chapter 11 petition.

The granting of Citibank's lift stay motion pursuant to 11 U.S.C. § 362(d)(2) is premised on the Court's conclusion that the Debtor's first amended plan of reorganization or any other plan of reorganization that might be filed by the Debtor cannot be confirmed due to the Debtor's inability to obtain the requisite acceptances by at least one validly classified class of claims that is impaired. 11 U.S.C. §§ 1122, 1111(b), 1129(a)(10), 1129(b)(1). Accordingly, the Debtor's first amended disclosure statement filed in connection with its first amended plan of reorganization will not be approved in that such disclosure statement describes a plan which cannot be confirmed.

Finally, because the stay is lifted in respect of property which constitutes virtually the entire estate in bankruptcy and the Debtor is unable to propose a confirmable plan, this Chapter 11 case serves no further purpose and will be dismissed. 11 U.S.C. §§ 105(a), 1112(b)(2), 1112(b)(3).

I.

1. On September 20, 1991, 266 Washington Associates ("Debtor"), a New York General Partnership,[1] filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and upon such filing was continued in possession of its assets and operation of its business pursuant to 11 U.S.C. §§ 1107 and 1108. The Debtor is the owner of real property located at 266–278 Washington Avenue in the Clinton Hill section of Brooklyn, New York and an apartment house complex located thereat (collectively, the "Property"). The Property consists of a six story multiple dwelling containing 113 rent stabilized residential apartment units and comprises the singular significant asset of the Debtor.[2]

2. The Property was acquired by the Debtor in July 1985 for approximately $1.4 million. Between 1986 and 1989, the Debtor initiated and implemented a program of extensive building renovation and improvements. Towards that end, in December 1986, the Debtor obtained a mortgage loan of $2.1 million from the Central Federal Savings Bank. In June 1990, the Debtor refinanced the Property through Citibank. On or about June 29, 1990, the Debtor

---

1. The partners of the Debtor are HPH Development Co., Gerald Weinger, and Wayne Robbins.

2. The Property is currently being operated by Kay Management Group, Inc. Two of the principals of Kay Management Group, Inc., Harry Kotowitz and Perry Finkelman, hold partnership interests in HPH Development Co., a general partner of the Debtor.

executed and delivered to Citibank a promissory note in the principal amount of $3.4 million (the "Note"). The Note bears interest on the unpaid principal balance at the rate of 10.68% per annum and required the Debtor to pay Citibank monthly installments in the amount of $31,559.59 from August 1, 1990, through July 1, 2000, which sum encompasses interest and amortization of principal. The entire indebtedness evidenced by the Note is due and payable, if not sooner paid, on July 1, 2000.

3. As security for the outstanding principal and interest owing under the Note, on or about June 29, 1990, the Debtor, as mortgagor, executed and delivered to Citibank, as mortgagee, a multifamily mortgage, assignment of rents, and security agreement (the "Mortgage"). Under the Mortgage, the Debtor gave the Property and all improvements, tenements, fixtures and personal property located at the Property as collateral for the Note. The Mortgage provides, among other things, that the Debtor shall pay to Citibank the required monthly installments of principal and interest payable under the Note, together with one-twelfth of, *inter alia,* annual water and sewer charges and real property taxes owing to the City of New York with respect to the Property. Under the Mortgage, the Debtor also assigned to Citibank all of the rents and other revenues of the Property by virtue of any lease or other agreement for occupancy or use of the Property.

4. On May 1, 1991, the Debtor defaulted on the Citibank loan by failing to make the required monthly payments of principal, interest, and property taxes, and thereafter failed to make any other payments due under the Note and Mortgage. By letter dated August 19, 1991, Citibank formally notified the Debtor as to the defaults and advised that if the sums owing were not paid by August 30, 1991, Citibank would accelerate the entire sum remaining unpaid. The Debtor failed to cure the defaults and Citibank, by letter dated August 30, 1991, notified the Debtor that it had declared all amounts owing under the Note and Mortgage to be immediately due and payable.

5. On September 12, 1991, on Citibank's motion, the Supreme Court of the State of New York, Kings County, issued an order appointing a receiver of all rents and profits of the Property. The Debtor filed its Chapter 11 petition about one week later. Since the filing, by agreement with Citibank approved by the Court, the Debtor has continued in control of its business and property.[3]

6. The Debtor defaulted on the Citibank loan a mere ten months after execution of the Note and Mortgage. The Debtor attributes its speedy default to the combined impact of the general recession in the economy and a substantial downturn in the real estate market. In that connection, the Debtor stresses a dramatic increase in vacancies at the Property between November 1990 and April 1991.[4] An apparent recovery of sorts was also rapid. By the time the Chapter 11 petition was filed in September 1991, the vacancy problem was already substantially ameliorated and approximately 96% of the apartments were occupied. This strong occupancy rate had further improved by February 1992 when the Debtor reported an approximate 98% occupancy (only two vacancies). Overall, the Property seems to be both well-managed and maintained.[5] In November 1991, the Debtor received an order (the "MCI Order") from

---

3. Pursuant to joint stipulation and consent order approved by the Court on October 24, 1991, and "so ordered" on November 22, 1991, Citibank agreed to permit the Debtor's use of cash collateral, i.e., post-petition rents, pursuant to 11 U.S.C. § 363(c)(2)(A). Paragraph 23 of the joint stipulation and consent order specifically reserves Citibank's right to seek relief from the automatic stay.

4. Transcript of February 6, 1992, at 34–35.

5. Citibank's appraisal of the Property prepared by Wm. A. White/Grubb & Ellis, Inc., candidly observes that the Property "is in good condition, having been substantially renovated in recent years.... As of the date of this appraisal [October 31, 1991] the building exhibited a strong occupancy rate (3 vacant units out of 112)." Creditor's Exhibit B at 30. The appraisal refers to only 112 units rather than 113, because a superintendent's unit is not considered.

the Division of Housing and Community Renewal, a State of New York agency, approving and recognizing about $498,000 of renovations to the Property in the nature of major capital improvements, which sums could be passed on to tenants through both permanent and temporary rent increases over the next several years. The immediate effect of the MCI order was to increase the Debtor's billable rent roll by approximately $4,000 per month.[6] Pointing to positive post-petition developments in the Debtor's business and urban renewal projects in Downtown Brooklyn in proximity to the Clinton Hill area, the Debtor asserts that the property has significant upside potential. The Debtor anticipates continuing strong occupancy rates, increasing billable rents, and effective rent collections. The Debtor's pro forma projected profit and loss statement for the calendar years ending 1992 and 1993, however, reflects operating losses even after reduced debt service to Citibank.[7] The projected losses for 1992 and 1993 are $26,000 and $9,000, respectively. Commencing January 1994, rental income, according to the Debtor, will increase so that the Debtor will be operating at a "positive cash flow basis" after payment of all expenses and debt service.[8]

7. Citibank submitted a detailed appraisal of the property.[9] The appraisal places the fair market value of the Property, as of October 31, 1991, at $2.8 million. The appraisal takes into account the Property's renovation, strong occupancy rates, the likelihood of recouping Property improvement costs by way of authorized rental increases and urban renewal projects in the Downtown Brooklyn area. At the lift stay hearings, the Debtor acknowledged that it had no equity in the Property, and the Debtor and Citibank stipulated that the value of the Property, for purposes of the lift stay motion, was between $2.8 million and $3.1 million. As of the date of the Chapter 11 filing on September 20, 1991, the total amount of Citibank's debt was about $3.6 million. Accordingly, Citibank is an undersecured creditor, in amounts ranging from $500,000 to $800,000. The under-collateralized portion of the claim makes Citibank overwhelmingly the Debtor's largest unsecured creditor. The Debtor's only other debt consists of five (5) unsecured trade claims aggregating $26,-800.[10] Assuming arguendo, as the Debtor strenuously urges, that the Property is increasing in value, Citibank's large unsecured deficiency will remain substantial for the foreseeable future, particularly in the context of the Debtor's remaining minimal debt.

8. On January 22, 1992, the eve of the first day of hearings on Citibank's lift stay motion, the Debtor filed a plan of reorganization ("Original Plan") and a disclosure statement. The Original Plan had three classes of creditors: i) Citibank's secured claim, ii) the $26,800 in unsecured trade claims, and iii) the unsecured portion of Citibank's claim. The Original Plan thus classified Citibank's deficiency claim as a class separate from other unsecured claims and proposed a 30% payment thereon.

9. On February 6, 1992, a few hours prior to the second day of hearings on Citibank's lift stay motion, the Debtor filed a first amended plan of reorganization ("Amended Plan") and a first amended disclosure statement. The Amended Plan divides claims into two classes. Class 1 con-

---

6. The collection of rental increases authorized by the MCI order is, of course, another issue.

7. The pro forma Citibank debt service is predicated on the loan restructuring contemplated by the Debtor's first amended plan of reorganization. Under this proposal, the annual debt service to Citibank would be trimmed from $378,-715 to $289,000, a reduction of nearly $90,000 per year for each of 1992 and 1993.

8. Debtor Exhibit No. 2 at 17. Elsewhere, the representative of the Debtor was somewhat less

sanguine and testified that in 1994 the Debtor will be "very close to breaking even." Transcript of February 6, 1992, at 46.

9. Creditor's Exhibit B.

10. These unsecured creditors are a contractor consultant, a vendor of heating oil, a gas utility, and an electric utility. The claims of these creditors would have been paid in due course, but for the filing of the Chapter 11 petition.

sists of Citibank's total claim without distinguishing between its secured and unsecured components, in effect treating the claim as if it is entirely a secured claim.[11] Upon the effective date of the Amended Plan, i.e., 60 days after confirmation, Citibank is to be paid $148,292 to cure accrued pre-petition interest and penalties. The remainder of Citibank's claim is to be paid pursuant to the original terms of the Note with two notable exceptions. First, Citibank is to receive escalating monthly payments representing a 9.25% average rate of interest, as opposed to the 10.68% interest rate provided in the Note. Specifically, interest payments under the Amended Plan are provided for as follows:

| Months After Confirmation | Monthly Interest Payment | Interest Rate |
|---|---|---|
| 1–24 | $24,083.33 | 8.5% |
| 25–48 | 25,500.00 | 9.0% |
| 49–60 | 26,916.00 | 9.5% |
| 61–until maturity (July 1, 2000) | 28,333.00 | 10.0% |

Second, amortization payments under the Note may be deferred for 24 months under the Amended Plan if cash flow is insufficient to make such payments.[12] At the end of the term of the Note, July 1, 2000, the Debtor is to make a balloon payment to Citibank in the sum of the outstanding principal amount. General unsecured claims are again placed in a discrete class apart from the Citibank claim. Class 2 of the Amended Plan contains the $26,800 in unsecured trade claims and proposes to pay these claims in full in twelve equal monthly installments. Class 3 of the Amended Plan is the equity interests of the Debtor's principals, i.e., its partners. The Amended Plan provides that the partners will retain their equity interests in return for new capital contributions. The Debtor's first amended disclosure statement filed with the Amended Plan states that during calendar year 1992, the partners will contribute $60,000 and during calendar year 1993, they will contribute $50,000.[13] Additionally, the Debtor's partners will guarantee the Debtor's obligations under the Amended Plan up to $150,000 over the first three years of the Amended Plan.[14]

## II.

Efforts by the parties, encouraged by the Court, to settle their dispute on a consensual basis have proven futile. Since it is now apparent that the Debtor is either unable or unwilling to propose a plan acceptable to Citibank, the Debtor's only hope for confirmation is resort to the cram down provisions of 11 U.S.C. § 1129(b). The Debtor states that it will employ those provisions and force confirmation on a nonassenting Citibank. Citibank, in turn, asserts that the Debtor cannot obtain confirmation under 11 U.S.C. § 1129(b) and that the automatic stay should be accordingly terminated pursuant to 11 U.S.C. § 362(d)(2).

As is unfortunately typical in cases of this sort, the contentions of the parties are wide ranging, covering the gamut of conceivable arguments in support of their respective positions and in opposition to the views espoused by the adversary. Both parties are emphatic in their contentions

---

11. The Debtor states that should the Court determine that Citibank's deficiency claim should be placed in another class, the Debtor will amend the Amended Plan and revert back to the three classes contained in its Original Plan. *See* Debtor's Post–Trial Memorandum of Law footnote at 27.

12. Any amortization payments deferred during the first twenty-four months after the effective date of the Amended Plan are due and payable in full in the twenty-fifth month.

13. Debtor's Exhibit No. 2 at 7.

14. Transcript of February 26, 1992, at 29. This guarantee would seem to be inclusive of the $110,000 the partners would contribute in 1992 and 1993.

that all the positions and arguments of the other side are wrong. We will attempt to summarize, as best we can, the points of view of the parties.

First of all, Citibank asserts that the Debtor is unable to confirm a reorganization plan because any plan proposed by the Debtor must be predicated upon an impermissible classification of creditors. Even if the Debtor was somehow able to surmount the classification obstacle, it still, according to Citibank, is unable to forcefully confirm a plan. In order to cram down a plan over an objecting class, i.e., Citibank, 11 U.S.C. § 1129(b)(1) requires that the plan be, *inter alia,* "fair and equitable." A plan is not "fair and equitable" unless, *inter alia,* it gives each holder of a secured claim a stream of payments, the present value of which is equal to the value of the collateral. 11 U.S.C. § 1129(b)(2)(A)(i)(II). To comply with this provision, a debtor is required to pay to the secured creditor interest at the prevailing market rate for a comparable loan, taking into full consideration the risk of nonpayment and default by the debtor and the quality of the security. According to Citibank, the Debtor lacks the willingness or capacity to provide anything near the requisite market rate of interest for the loan sought to be imposed. Another insurmountable obstacle to the Debtor's efforts to propose a "fair and equitable" plan, Citibank argues, is the absolute priority rule. 11 U.S.C. § 1129(b)(2)(B)(ii). Simply stated, the absolute priority rule provides that if a plan is to be crammed down over a dissenting class of unsecured creditors whose claims are not being paid in full, no class of claims or interests junior to the dissenting class may receive or retain any consideration. Citibank argues that the Debtor's plan proposals do not pay its claim in full and thus violate the absolute priority rule in that the holders of the Debtor's equity interests, i.e., its partners, retain their interests. Citibank further argues that the new capital contributions, which the Debtor's partners propose to infuse, do not cure the violations of the absolute priority rule because, i) the new value exception to the

absolute priority rule did not survive enactment of the Bankruptcy Code, and ii) even assuming the survival, the proposed capital contributions do not satisfy the requirements of the new value exception to the absolute priority rule.[15] Finally, Citibank reminds the Court that the Debtor's default occurred only ten months after obtaining the loan. Citibank asserts that such rapid deterioration and the Debtor's stated quick recovery is quite unusual. Under these circumstances and judging from the Amended Plan, which represents the Debtor's best offer, Citibank argues that it is just unfair to impose an involuntary loan restructuring which, according to Citibank, compels an undercollateralized loan at below market interest rate and places the brunt of the risk going forward on the Bank, with the benefits, if any, inuring to the Debtor's partners.

The position of the Debtor is the reverse of that espoused by Citibank on all issues. The Debtor stoutly proclaims its current financial distress, optimistic future, and concomitant need to restructure the Citibank loan. To foster reorganization, the Debtor perceives no impediment to a strategic separate classification of Citibank's unsecured claim from that of its other unsecured claims. The Debtor asserts that it proposes to make deferred payments, the present value of which is equal to the value of Citibank's collateral, and to accomplish that it is proposing the payment of interest at the necessary rate of interest. Further, the Debtor argues that because it proposes to pay Citibank in full, there is no absolute priority issue. And, even assuming that its proposal does not provide full payment to Citibank, the new capital contribution which the Debtor's partners propose to infuse satisfies the requirements of the still viable new value exception to the absolute priority rule, thereby permitting the partners to retain their interests.

### III.

Upon the filing of a bankruptcy petition, a secured creditor is automatically stayed,

---

**15.** For the requirements of the new value exception to the absolute priority rule, see *Case v. Los* *Angeles Lumber Prods. Co.,* 308 U.S. 106, 121–22, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939).

pursuant to 11 U.S.C. § 362(a), from acting to realize the value of the collateral received from a debtor. The stay is pervasive and one of the most important tools available to a debtor seeking to reorganize. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977), U.S.Code Cong. & Admin.News 1978; 5787. However, restraining creditors from enforcing their legitimate legal rights is strong medicine and our bankruptcy laws do not sanction the stay for stay's sake. Cognizant of the pernicious effects the automatic stay could have on secured creditors, Congress provided in subsection (d) of Section 362 that relief from the effect of the stay is necessary and appropriate under certain circumstances. In relevant part, 11 U.S.C. § 362(d) states as follows:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

. . . .

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

The allocation of burdens of proof in actions seeking relief from the automatic stay is set forth in 11 U.S.C. § 362(g). The moving party carries the burden of proof only as to the debtor's equity in the property. The party opposing the lifting of the stay carries the burden as to all other issues.

The Debtor has acknowledged that the value of the Property does not exceed $3.1 million and that Citibank's claim is approximately $3.6 million. Therefore, the Debtor has no equity in the Property under 11 U.S.C. § 362(d)(2)(A). The second element of 11 U.S.C. § 362(d)(2) is that the Property "is not necessary to an effective reorganization." Here, probably the only instance where the parties agree, there is no dispute that loss of the Property will make reorganization of the Debtor absolutely impossi-

ble. However, this is not enough to prevent lifting of the stay under 11 U.S.C. § 362(d)(2). Instead, it must be shown by the Debtor that loss of the property would prevent an *"effective* reorganization." 11 U.S.C. § 362(d)(2)(B) (emphasis added). The United States Supreme Court has interpreted the phrase "effective reorganization" in U.S.C. § 362(d)(2)(B) to require:

[N]ot merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.* This means, as many lower courts, including the en banc court in this case, have properly said, that there must be "a reasonable possibility of a successful reorganization within a reasonable time."

*United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 375–76, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988).

■ The definition of "effective reorganization" articulated by the Supreme Court in the *Timbers* case necessarily implicates, to a degree, consideration of the plan confirmation standards of 11 U.S.C. § 1129. Clearly, "effective reorganization" must mean that confirmation of a reorganization plan in the near future is within the realm of possibility. We agree with the Debtor that the requirements for successful opposition to a lift stay motion under 11 U.S.C. § 362(d)(2) is not to be equated with sustaining the burden of confirming a reorganization plan and that a lift stay hearing should not be transformed into a confirmation hearing. The "effective reorganization" requirement enunciated by the Supreme Court does, however, require a showing by a debtor and a determination by the bankruptcy court that a proposed or contemplated plan is not patently unconfirmable and has a realistic chance of being confirmed.

Classification of creditors is often the initial combat zone in a contested confirmation process. This is certainly the situation here and the Debtor is defeated in the first skirmish. All of the Debtor's plan proposals suffer from insurmountable threshold

statutory flaws relating to classification of claims. For the reasons hereinafter set forth, these fatal defects lock the gate to cram down under 11 U.S.C. § 1129(b). The Debtor's inability to even open the gate to 11 U.S.C. § 1129(b) renders moot consideration of the multitude of other issues raised by Citibank, all of which relate to the efficacy of cram down. We turn now to the overarching and dispositive issue in this dispute between Citibank and the Debtor— the classification of claims.

## IV.

The Chapter 11 classification of claims provision, 11 U.S.C. § 1122, does not exist in a vacuum; it interfaces with the plan confirmation statute, 11 U.S.C. § 1129. Section 1129 provides two distinct avenues for confirmation of a reorganization plan, one grounded on the consent of impaired classes of claims and the other hinged on a judicial cram down over the objections of impaired classes. A bankruptcy court can confirm consensually under 11 U.S.C. § 1129(a) if all the requirements of subsection (a) are satisfied, including (a)(8), which necessitates acceptance of the plan by all impaired classes of claims. Alternatively, a plan can be confirmed over dissenting classes of claims under 11 U.S.C. § 1129(b) if all the requirements of subsection (a) of Section 1129 are satisfied, excluding (a)(8), and the bankruptcy court is satisfied that the plan does not discriminate unfairly and is fair and equitable with respect to each class of impaired claims that has not accepted the plan.

Access by a plan proponent to the alternative cram down mechanism is not always assured. An essential statutory condition precedent to utilization of 11 U.S.C. § 1129(b) is fulfillment of the 11 U.S.C. § 1129(a)(10) requirement that at least one impaired class (not counting the votes of insiders) must have accepted the plan.[16] Under 11 U.S.C. § 1126(c), a class of claims accepts a plan if more than one-half in

number and at least two-thirds in amount of claims voting in a class favor the plan. Thus, one creditor whose claim totals more than one-third of all claims in the class will be able to prevent the class from accepting the plan by voting against the plan.

Classes of claims must separately vote whether to accept a plan of reorganization and obviously such grouping may well affect the integrity of the Chapter 11 voting process. The Chapter 11 provision governing classification of claims is 11 U.S.C. § 1122. Section 1122 provides in full as follows:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

Generally, unsecured creditors hold substantially similar claims; they are claimants of equal legal rank entitled to share pro rata in values remaining after payment of secured and priority claims. It has accordingly been observed that "[u]nsecured claims will, generally speaking, comprise one class, whether trade, tort, publicly held debt or *a deficiency of a secured creditor.*" *In re Pine Lake Village Apartment Co.,* 19 B.R. 819, 830 (Bankr.S.D.N.Y.) (quoting 3 *Norton Bankr.L. & Prac.,* § 60.05), *reh'g denied,* 21 B.R. 478 (Bankr. S.D.N.Y.1982).

A number of courts of appeals have grappled with the issue of the proper classification of unsecured claims under the Bankruptcy Code. Some have opined that as a general rule, all unsecured claims are alike and should not be separately classified. *See Granada Wines, Inc. v. New*

---

**16.** Section 1129(a)(10) reads in full as follows:

(a) The court shall confirm a plan only if all of the following requirements are met:
. . . .

(10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

*England Teamsters and Trucking Indus. Pension Fund*, 748 F.2d 42, 46 (1st Cir. 1984) (separate classifications for unsecured creditors are justified only upon a showing that the legal characteristics of their claims are different); *see also Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture )*, 948 F.2d 134, 139 (5th Cir.1991) ("A fair reading of both subsections [11 U.S.C. § 1122(a) and (b) ] suggests that ordinarily 'substantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class."). The statute's approval in subsection (b) of § 1122 of a separate classification of small claims for administrative convenience and the express reference in subsection (a) to that classification as an exception to seemingly the general rule, lends support to the view that Section 1122 otherwise requires unsecured claims, being substantially similar claims, to be placed in one class.

Other courts of appeals have opined that Section 1122 grants a debtor considerable discretion to group similar claims in different classes. *In re Jersey City Medical Ctr.*, 817 F.2d 1055, 1060–61 (3d Cir.1987); *Hanson v. First Bank of South Dakota, N.A.*, 828 F.2d 1310, 1312–13 (8th Cir.1987); *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.)*, 800 F.2d 581, 584–86 (6th Cir. 1986) (discussing the legislative history of Section 1122). These cases point out that subsection (a), by its express language, only addresses the problem of dissimilar claims being included in the same class and prohibits such inclusion; it does not address, though, the presence of similar claims in different classes. According to these cases, the discretion of a debtor to classify similar claims in different classes is, however, not unbridled. The potential for manipulative classification of claims would be significant otherwise. As the Sixth Circuit observed:

> [T]here must be some limit on a debtor's power to classify creditors in such a manner [to assure that at least one class of impaired creditors will vote for the plan and make it eligible for cram down con-

sideration by the court]. The potential for abuse would be significant otherwise. Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class.

*In re U.S. Truck Co.*, 800 F.2d at 586 (footnote omitted). There must be some independent reasonable grounds or valid justification for separately classifying substantially similar claims. In this connection, the Fifth Circuit held that:

> We conclude that if § 1122(a) permits classification of "substantially similar" claims in different classes, such classification may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims.

*In re Greystone III Joint Venture*, 948 F.2d at 139.

The problem of classifying Citibank's claim can only be understood within the framework of a brief explanation of 11 U.S.C. §§ 506(a) and 1111(b). Section 1111(b) deals with the rights in a Chapter 11 case of a partially secured or undersecured creditor like Citibank and must be read in conjunction with Section 506(a). Under Section 506(a), a lender's secured claim is limited to the value of its collateral; the remainder of the claim, if any, is an unsecured claim (hereinafter often referred to as an "unsecured deficiency claim"). Since the collateral here, i.e., the Property, is worth less than the claim, Citibank has two different claims under Section 506(a)—a secured claim ranging from $2.8—$3.1 million and an unsecured deficiency claim of at least $500,000. Under Section 1111(b)(1)(A), non-recourse claims secured by liens on property of the estate, like that of Citibank, are treated as though they were recourse claims, with the claimant having an unsecured claim against a debtor to the extent of a deficiency. Such claims are accorded this special recourse treatment, unless an election is made under Section 1111(b)(2). If an election is made under Section 1111(b)(2), the electing class

is entitled to have the entire claim related to the collateral secured by a lien, even if the value of the collateral is less than the claim and notwithstanding Section 506(a).[17] One case summed up this complicated interrelationship between 11 U.S.C. §§ 506(a) and 1111(b) as follows:

> An undersecured creditor, a creditor whose security is worth less than the total amount owed to the creditor, may choose to have its claim treated in two manners. First, it can have a bifurcated claim, with a secured claim to the extent of the value of the collateral, and an unsecured claim for the remainder of the debt owed. 11 U.S.C. § 506(a). Second, the secured creditor can waive its unsecured claim and elect to have its total claim treated as secured. 11 U.S.C. § 1111(b)(2).

*In re Griffiths*, 27 B.R. 873, 875 (Bankr. D.Kan.1983) (citation omitted).

The Debtor's ability to classify Citibank's unsecured deficiency claim in a class separate from that of its other unsecured claims is critical to its reorganization efforts. Obviously, the Debtor is not desirous of including Citibank's unsecured claim in one class with its trade debt because the unsecured deficiency claim will represent at least 95% of the unsecured claims in this class. Because of the sheer size of its unsecured claim, Citibank could effectively block confirmation by causing a unitary class of unsecured creditor claims to reject a plan proposed by the Debtor. There would be no impaired accepting class under 11 U.S.C. § 1129(a)(10) and the Debtor therefore would be barred from access to cram down under 11 U.S.C. § 1129(b).

All of the Debtor's plan proposals are premised on the isolation of its unsecured trade debt as a class separate from Citibank's unsecured deficiency claim. The Debtor's Original Plan created two separate classes of unsecured claims. The Debtor's Amended Plan establishes one class of unsecured claims, i.e., the trade debt, and lumps Citibank's unsecured deficiency claim together with Citibank's secured claim in another class and purports to treat the entire Citibank claim as if it was secured. Again, Citibank's unsecured deficiency claim is segregated from the Debtor's trade debt. If this classification is not acceptable, the Debtor says it will go back to two separate classes of unsecured claims as under the Original Plan, but will treat Citibank's secured and deficiency claims in a manner which is identical to the treatment proposed under the Amended Plan. Thus, the specific issue before the Court is whether the Debtor's classification schemes are justified or whether they are transparent attempts to obtain an affirmative vote of an impaired class in order to invoke the cram down provisions of 11 U.S.C. § 1129(b).

Under analogous circumstances involving single asset Chapter 11 debtors where lenders, like Citibank in this case, held overwhelming unsecured deficiency claims, many courts have held that separate classification of the unsecured deficiency claims from other unsecured claims was not justifiable and accordingly impermissible. *See In re Cantonwood Assocs. Ltd. Partnership*, 138 B.R. 648 (Bankr.D.Mass.1992); *In re Greystone III Joint Venture*, 948 F.2d 134; *Travelers Ins. Co. v. Bryson Properties XVIII (In re Bryson Properties XVIII)*, 961 F.2d 496 (4th Cir.1992); *Piedmont Assocs. v. Cigna Property & Casualty Ins. Co.*, 132 B.R. 75 (N.D.Ga.1991); *In re Lumber Exch. Ltd. Partnership*, 125 B.R. 1000 (Bankr.D.Minn.), *aff'd sub nom. Lumber Exch. Bldg. Ltd. Partnership v. Mut. Life Ins. Co. of New York (In re Lumber Exch. Bldg. Ltd. Partnership)*, 134 B.R. 354 (D.Minn.1991); *In re Valrico Square Ltd. Partnership*, 113 B.R. 794 (Bankr. S.D.Fla.1990); *In re Waterways Barge Partnership*, 104 B.R. 776 (Bankr. N.D.Miss.1989).

The Debtor argues that Citibank's claims may be separately classified from its other unsecured claims because the legal nature

---

**17.** If an election is made under Section 1111(b)(2), the plan must provide for the electing class to receive, on account of the secured claim, payments, either present or deferred, of a principal face amount equal to the entire claim and of a present value equal to the value of the collateral.

of the claims are different. First, unlike general unsecured creditors, Citibank has a state law non-recourse secured claim against the Debtor. Furthermore, unlike Citibank, general unsecured creditors have a right to proceed against the Debtor's general partners. Moreover, Citibank as a *secured* creditor has another interest which it does not share with general unsecured creditors. As authority in support of these arguments to justify separate classification, the Debtor cites *Travelers Ins. Co. v. Bryson Properties XVIII (In re Bryson Properties XVIII)*, 129 B.R. 440 (M.D.N.C. 1991); *In re 222 Liberty Assocs.*, 108 B.R. 971 (Bankr.E.D.Pa.1990); *In re Aztec Co.*, 107 B.R. 585 (Bankr.M.D.Tenn.1989). These contentions were all raised in the lower courts in the *Greystone III Joint Venture* and *Bryson Properties XVIII* cases and rejected by the Fifth and Fourth Circuits, respectively. *In re Greystone III Joint Venture*, 102 B.R. 560 (Bankr. W.D.Tex.1989), *aff'd sub nom. Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 127 B.R. 138 (W.D.Tex.1990), *rev'd*, 948 F.2d 134 (5th Cir.1991) (corrected, reinstated, reh'g, en banc, denied); *Travelers Ins. Co. v. Bryson Properties XVIII (In re Bryson Properties XVIII)*, 129 B.R. 440 (M.D.N.C.1991), *rev'd*, 961 F.2d 496 (4th Cir.1992). In essence, these assertions of dissimilarity suggested by the Debtor are oblivious to the fact that the Bankruptcy Code (11 U.S.C. § 1111(b)(1)(A)) eliminated the legal distinction between non-recourse deficiency claims and other unsecured claims and that both the deficiency claims and other unsecured claims share common priority and rights against a debtor's estate.[18]

■ Apparently recognizing that it cannot classify Citibank's unsecured deficiency claim and the other unsecured claims in separate unsecured creditor classes, the Debtor in the Amended Plan bunches the entire Citibank claim and would force Citibank to accept treatment as a fully secured creditor. While this proposed treatment may at first appear magnanimous on the Debtor's part it is, in fact, in direct violation of 11 U.S.C. §§ 506(a) and 1111(b). The practical effect of such classification is to vitiate Citibank's rights of suffrage as an unsecured creditor.

As pointed out above, Section 506(a) entitles a secured creditor to an unsecured claim to the extent the claim is undersecured. Section 1111(b) expressly gives a class of secured creditors the right to elect whether their claims should be treated as fully secured or as secured claims to the extent of the value of the collateral and as unsecured claims for the deficiency. As the plain words of Section 1111(b) suggest, the choice of whether a secured claim will be treated as fully secured or split into secured and unsecured components belongs entirely to the creditor. The choices available to a secured creditor under Section 1111(b) surely include a statutory option to employ an unsecured deficiency claim to have a significant voice in, and if its claim is large enough, dominate the unsecured class so that it can avoid the genre of tactical classification of claim schemes being used in this case to silence Citibank. *In re Meadow Glen, Ltd.*, 87 B.R. 421, 426–27 (Bankr.W.D.Tex.1988); *In re Pine Lake Village Apartment Co.*, 19 B.R. at 831. As the Fifth Circuit said in *In re Greystone III Joint Venture*:

> The purpose of § 1111(b) is to provide an undersecured creditor an election with respect to the treatment of its deficiency claim. Generally, the creditor may elect recourse status and obtain the right to vote in the unsecured class, or it may elect to forego recourse to gain an allowed secured claim for the entire amount of the debt.... Plan proponents

---

**18.** The Debtor refers also to the following cases which permit the separate classification of unsecured deficiency claims. *Penn Mut. Life Ins. Co. v. Woodscape Ltd. Partnership (In re Woodscape Ltd. Partnership)*, 134 B.R. 165 (Bankr.D.Md. 1991); *In re Club Assocs.*, 107 B.R. 385 (Bankr. N.D.Ga.1989); *In re Sherwood Square Assocs.*, 107 B.R. 872 (Bankr.D.Md.1989). The reasons or rationale for separate classification in these cases are not too clear, but would seem also to revolve about the asserted justifications for separate classification discredited by the Fifth and Fourth Circuits.

could effectively disenfranchise the holders of such [unsecured deficiency] claims by placing them in a separate class and confirming the plan over their objection by cramdown.

948 F.2d at 140.[19]

The Debtor further asserts that there is no issue of improper classification so long as a plan does not unfairly discriminate between classes of similar claims, and the Amended Plan and any other plan the Debtor might propose, the Debtor argues, does not and would not unfairly discriminate between such claims. Whether or not a plan discriminates unfairly is besides the point at this juncture. The Debtor hopelessly confuses two discrete legal issues by merging them into a seamless web. Unfair discrimination is a cram down issue under 11 U.S.C. § 1129(b)(1). Classification of claims are 11 U.S.C. §§ 1122 and 1129(a)(10) issues, the propriety of which will determine whether cram down could even be considered by a bankruptcy court.

■ Citibank's unsecured deficiency claim of at least $500,000 and the $26,800 of other unsecured claims are claims of equal rank with identical rights to the Debtor's estate under the Bankruptcy Code. There is no valid reason or justification for separately classifying them. The only difference between these claims is the size of the claims which, standing alone, does not amount to a dissimilarity warranting separate classification under 11 U.S.C. § 1122. Clearly, the only possible reason which this Debtor has for separate classification is to fabricate an accepting class under 11 U.S.C. § 1129(a)(10) in order to effectuate a cram down. The intended consequences of such classification represents a manipulation of the Chapter 11 voting process and causes a disenfranchisement of the Debtor's only meaningful creditor—Citibank. The Debtor's Original Plan nullifies the numerical effect of Citibank's voting rights as an unsecured creditor. The Debtor's Amended Plan, in effect, eliminates that right completely by lumping it with Citibank's secured claim. And, if the Amended Plan does not pass muster, the Debtor proposes to go back to its original two separate classes of unsecured claims and thereby again render nugatory Citibank's numerical superiority. As the bankruptcy court said in *In re Waterways Barge Partnership:*

> In the case before this Court, it is patently obvious that the only reason that the debtor has separately classified the unsecured claims in Class III and Class IV is to create a favorable class that will vote to accept the plan to meet the test of § 1129(a)(10). Although there is no direct prohibition against this separate classification in the Bankruptcy Code, the manipulative approach in this case is unfair and inequitable....

> As the debtor candidly admits, the separate classification was not undertaken for purposes of administrative convenience. The debtor's argument, however, that the claims are dissimilar is without merit. The claims are all unsecured pre-petition claims. The only difference is the size of the claims which, standing alone, does not amount to a distinguishable dissimilarity.... To permit these two creditors to enjoy the same voting powers as MARAD defies the concepts of fairness and equity. This Court can find no justifiable reasons for permitting separate classification in this case; therefore, confirmation of the debtor's plan of reorganization must be denied for its failure to satisfy the test of § 1129(a)(10).

104 B.R. at 785–86; *In re Greystone III Joint Venture,* 948 F.2d at 139 (there is but one clear rule under 11 U.S.C. § 1122: "[T]hou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan."); *see In re Mastercraft Record Plating, Inc.,* 32 B.R. 106, 108 (Bankr.S.D.N.Y.1983)

---

**19.** Citibank is unwilling to have its unsecured deficiency claim disenfranchised. Indeed, since Citibank has not made an election that its claim be treated as a fully secured claim under 11 U.S.C. § 1111(b)(2) prior to the conclusion of the May 14, 1992 hearing on the Debtor's disclosure statement, it would appear that Citibank, by its inaction, has chosen to have its claim split into secured and unsecured components. *See* Fed.R.Bankr.P. 3014.

("Classification cannot be used to divide like claims into multiple classes in order to create a consenting class so as to permit confirmation."), *rev'd on other grounds*, 39 B.R. 654 (S.D.N.Y.1984).

Furthermore, the Debtor's classification of claims assumes acceptance by a legitimate class of unsecured claims that is impaired, i.e., the nominal trade claims. The $26,800 of the unsecured claims may well be an artificially impaired class. The Debtor has not been servicing the debt to Citibank for a long time and assuredly has the funds to pay these claims in full at confirmation and if for some reason such funds are not available, the Debtor's partners, in all likelihood, have access to funds sufficient to pay these claims at confirmation.[20]

Finally, the Debtor argues policy. The Debtor urges that Chapter 11 favors reorganizations and that the statute should be construed in furtherance of its rehabilitation purposes. The Debtor reminds the court that in cases like these, if all unsecured claims are classified together, the deficiency claim of the undersecured lender will dominate the vote and the chances of finding another impaired class not comprised of insiders is almost impossible. The short answer to the Debtor's dilemma is that broad "policy" considerations cannot override specific Chapter 11 statutory provisions. *In re Cantonwood Assocs. Ltd. Partnership*, 138 B.R. at 655. Sections 1122, 1111(b), 1129(a)(10), and 1129(b) embody particular policy considerations and necessary prerequisites for attaining the grander goal of reorganization. Section 1122 bars classification of claims patterned to manipulate the Chapter 11 voting process. Section 1111(b) permits deemed recourse lenders the option to vote an unsecured deficiency claim. Section 1129(a)(10) operates as a statutory gatekeeper barring access to cram down where there is absent even one impaired class accepting the plan. Cram down is a powerful remedy available to plan proponents under which dissenting classes are compelled to rely on difficult judicial valuations, judgments, and determinations. The policy underlying Section 1129(a)(10) is that before embarking upon the tortuous path of cram down and compelling the target of cram down to shoulder the risks of error necessarily associated with a forced confirmation, there must be some other properly classified group that is also hurt and nonetheless favors the plan. As a bankruptcy court so aptly summed up:

> In short, [under 11 U.S.C. § 1129(a)(10)] there must be some one other than the debtor, other than the insiders, and other than the target of the cram down, who cares enough about the reorganization and whose rights must also be considered to invoke the equitable grounds that justify resort to cram down. If cramdown is not available, it is pointless to further consider a plan which requires cramdown for its success. Because the reorganization which these Debtors contemplate is not possible, it follows as a matter of logic that the Debtors have failed to carry their burden that an effective reorganization is possible.

*In re Anderson Oaks (Phase I) Ltd. Partnership*, 77 B.R. 108, 112–13 (Bankr. W.D.Tex.1987).

The Debtor's classification of claims predicament is insoluble. The Debtor's Amended Plan violates 11 U.S.C. §§ 1122, 1111(b) and does not meet the requirements of 11 U.S.C. § 1129(a)(10). The Amended Plan is thus not confirmable. Similarly, no other plan of reorganization which might be proposed by the Debtor is capable of confirmation. Having found that the Debtor has failed to carry its burden of proof to establish the likelihood of an effective reorganization, the automatic stay is lifted pursuant to 11 U.S.C. § 362(d)(2) and Citibank will be permitted to foreclose on the Property.

## V.

As indicated above, the Court has held and concluded a hearing on the Debtor's

---

**20.** In any event, Citibank is willing to pay these $26,800 in other unsecured claims. Citibank states that it "is prepared to satisfy all other unsecured claims outstanding against the Debt- or so that the Debtor cannot use those claims to disenfranchise Citibank and dilute the votes to which is entitled." Post–Trial Brief of Citibank at 22, n.7.

first amended disclosure statement filed in connection with the Amended Plan. Decision was reserved on the adequacy of information contained in the first amended disclosure statement.

■ A disclosure statement is a solicitation document approved by a bankruptcy court as containing adequate information so that an informed determination can be made whether to accept or reject a reorganization plan. 11 U.S.C. § 1125. The approval of a disclosure statement by a bankruptcy court is an early step in the confirmation process, followed by time consuming and expensive solicitation procedures and confirmation hearings. Having found patent legal defects in the Amended Plan rendering it not confirmable, the Court denies approval of the Debtor's first amended disclosure statement. A disclosure statement will not be approved where, as here, it describes a plan which is fatally flawed and thus incapable of confirmation. *In re Eastern Maine Elec. Coop., Inc.*, 125 B.R. 329 (Bankr.D.Me.1991); *In re Valrico Square Ltd. Partnership*, 113 B.R. at 796 ("Soliciting votes and seeking court approval on a clearly fruitless venture is a waste of the time of the Court and the parties."); *In re Pecht*, 53 B.R. 768 (Bankr.E.D.Va. 1985); *In re Kehn Ranch, Inc.*, 41 B.R. 832 (Bankr.D.S.D.1984).

## VI.

The automatic stay is lifted in this single asset Chapter 11 case and foreclosure of the Property is now permitted to proceed. There are no other assets of any meaningful nature to be administered or protected by the bankruptcy court. There is no creditor body constituency which might justify what is, in truth, a one creditor bankruptcy case and that creditor, Citibank, does not need or want this Chapter 11 case. There are no jobs that would be preserved by continuation of this Chapter 11 case. And, most importantly, the Debtor is unable to confirm any plan of reorganization.

■ A bankruptcy court may dismiss a Chapter 11 case under 11 U.S.C. § 1112(b)(2) and (b)(3) if a debtor is unable to effectuate a plan or if there is unreasonable delay that is prejudicial to creditors. This Court's determination that the Debtor is unable to effectuate any plan which can be confirmed is a proper basis for dismissal under 11 U.S.C. § 1112(b)(2). *Fossum v. Federal Land Bank (In re Fossum)*, 764 F.2d 520, 521–22 (8th Cir.1985); *In re Lumber Exch. Ltd. Partnership*, 125 B.R. at 1010 ("Presumably, 'inability' [under 11 U.S.C. § 1112(b)(2)] means inability to effectuate a confirmable plan."). Furthermore, Citibank has already been impeded in the enforcement of its state law contractual rights for a protracted period and any additional delay would surely be prejudicial to this only "real" creditor.

■ This two party imbroglio arises from a default on the heels of a refinancing and pursuit of a restructuring under cover of a Chapter 11. More than sufficient time has elapsed without any success in reaching a consensual arrangement between the two combatants. An imposed restructuring is unattainable because forced confirmation via a cram down cannot be invoked. Bankruptcy courts are not required to retain Chapter 11 cases on their dockets which cannot achieve their *raison d'etre*, i.e., confirmation of a reorganization plan. The absence of a request by a party in interest is not an impediment to this Court's authority to *sua sponte* dismiss this Chapter 11 case pursuant to 11 U.S.C. § 1112(b).[21] For the power of the court to dismiss a bankruptcy case on its own motion or otherwise to act *sua sponte*, we must turn to another provision of the Bankruptcy Code, 11 U.S.C. § 105(a). Section 105(a), reads, in full, as follows:

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a

---

**21.** Dismissal of the case does not preclude further efforts by the Debtor to negotiate a settlement. It only means that the bankruptcy umbrella is removed and further efforts, if any, to resolve the dispute between the Debtor and Citibank must be in another context, presumably the ensuing state court foreclosure proceedings.

party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

## VII.

Based on all of the foregoing, the motion of Citibank to terminate the automatic stay is granted pursuant to 11 U.S.C. § 362(d)(2), the Debtor's first amended disclosure statement is disapproved, and the Chapter 11 case of 266 Washington Associates is dismissed pursuant to 11 U.S.C. §§ 105(a), 1112(b)(2), and 1112(b)(3).