**In re B & B WEST 164th STREET CORP., Debtor.**

**In re B & B WEST 165th STREET CORP., Debtor.**

**Bankruptcy Nos. 191–14992–260, 191–14993–260.**

United States Bankruptcy Court, E.D. New York.

Dec. 2, 1992.

---

Zeichner Ellman & Krause by Nathan Schwed, New York City, for First Nationwide Bank.

Alan Scott, New York City, for Weinstein I and Weinstein II.

Leo Fox, New York City, for debtors.

Office of U.S. Trustee by Douglas E. Spelfogel, Garden City, NY.

## DECISION

CONRAD B. DUBERSTEIN, Chief Judge.

This matter comes before the Court on the motion of First Nationwide Bank ("FNB") which seeks to terminate the automatic stay pursuant to § 362(d)(1) and (2) and to enjoin the Debtors, B & B West 164th Street Corp. and B & B West 165th Street Corp. ("164th" and "165th" individually or "the Debtors" jointly) from using cash collateral. The Debtors have each filed a motion seeking permission to use the cash collateral. Another unsecured creditor of 165th Street, Weinstein II, which purports to hold a second mortgage on the property, also seeks the termination of the automatic stay pursuant to § 362(d)(1). This Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 1334 and 157(a). The motions to terminate the stay are core proceedings pursuant to § 157(b)(2)(G). For the reasons hereinafter set forth, the motions to terminate the stay are hereby granted and the cases are dismissed.

## FACTS

The issues before this Court involve the Chapter 11 filings of two different corporations, 164th Street and 165th Street. Each corporation has a single piece of real estate as its sole asset and has Moishe Bodner and Brian Berry as its principals. The major creditor in each case is First National Bank, a secured creditor, with the only other significant creditors, aside from small trade claims, being two limited partnerships, each having Mr. N. Weinstein as their general partner ("Weinstein I" and "Weinstein II" individually or "Weinstein" jointly).

164th Street owns real property containing 52 apartments and 8 stores located at 545 West 164th Street in New York, New York. 165th Street owns real property containing 56 apartments and 6 stores located at 540 West 165th Street in New York, New York.

164th Street acquired the property on or about December 12, 1989, from Weinstein I

for approximately $1.95 million. In exchange for a loan in the amount of $1.5 million, FNB obtained a first mortgage on the property, which was duly recorded. Weinstein I also loaned the Debtor monies to effectuate the purchase. According to the Debtor, the principal amount due Weinstein I is $575,000. No mortgage was received by Weinstein I in this transaction.

165th Street acquired its property on or about February 9, 1990, from Weinstein II for approximately $2.25 million. In exchange for a loan in the amount of $1.6 million, FNB obtained a first mortgage on the property, which was duly recorded. Weinstein II, through two notes, also loaned the Debtor monies to effectuate the purchase. The Debtor alleges that the first note was in the principal amount of $400,000 and the second in the principal amount of $95,000. Weinstein II's counsel admitted that the second note was to be secured by a second mortgage which was never recorded. He also asserted that the second note was secured by the Debtor's stock. Furthermore, he claims that Weinstein II received and recorded a third mortgage in exchange for the $95,000 note.

The monthly installment which each Debtor was required to pay FNB included both principal and interest and was $13,-721.09 for 164th Street beginning February 1, 1990, and $14,635.83 for 165th Street, beginning April 1, 1990. Since the monthly payments would be insufficient to repay the entire obligations, the remaining indebtednesses were due in balloon payments no later than January 1, 2000, for 164th Street and March 1, 2000, for 165th Street.

Each Debtor also executed and turned over to FNB absolute assignments of rents and their interests in the leases. However, both Debtors claim that the assignments have not been perfected.

In mid–1990, the Debtors apparently defaulted under the terms of the notes and mortgages. Negotiations failed to yield a satisfactory resolution and in November, 1990, FNB commenced foreclosure proceedings against the Debtors in the New York State Supreme Court. *First Nationwide Bank v. B & B 164th Corp. et al.*, Index No. 00055/90 (Huff, J.); *First Nationwide Bank v. B & B West 165th Corp. et al.*, Index No. 27672/90 (Moskowitz, J.). Pursuant to Supreme Court orders dated June 27, 1991, summary judgments were granted in favor of FNB against each Debtor. Prior to these orders, the Supreme Court appointed a Receiver for the 164th Street property. No Receiver was appointed for the 165th Street property as the Debtor filed its petition before one could be appointed.

On July 30, 1991, the Debtors filed their petitions seeking relief under Chapter 11 of the Bankruptcy Code. On August 5, 1991, the Court entered FNB's Orders to Show Cause preventing the Debtors from using cash collateral in which FNB has an interest until a hearing could be held. The Debtors opposed the motions and in response filed motions to: (1) compel FNB and the Receiver for the 164th Street property to return any of the Debtors' property held by either FNB or the Receiver; (2) directing FNB to file an accounting of any rents collected; and (3) seeking authorization to use the rent proceeds to maintain their respective premises.

At a hearing before this Court on August 14, 1991, the parties announced that they had reached an agreement allowing the Debtors to use cash collateral for approximately thirty days. Thereupon, at the request of counsel for the Debtors, this Court ordered that the tenants of each building pay their rent directly to the respective Debtor. The Court adjourned the hearing on the two motions.

On October 8, 1991, FNB moved for relief from the automatic stay under §§ 362(d)(1) and (2) against each Debtor. At that time, FNB stated that it was due the approximate principal sums of $1,496,-966.93 for 164th Street and $1,598,075.77 for 165th Street, plus interest and other required payments as provided for in the mortgages and notes.

After a hearing held on October 29, 1991, the Court directed 164th Street to pay $5,000, and 165th Street to pay $8,500, to FNB by November 8, 1991, and to provide an accounting of any available funds by

December 3, 1991. FNB characterized these as adequate protection payments.

On January 8, 1992, Weinstein II filed a motion seeking relief from the stay regarding 165th Street.

In order for the Court to determine the value of the properties affected and to make a proper determination of the issues, the Court appointed an independent appraiser to value the properties.

At a hearing on January 30, 1992, the Debtors were each directed to make monthly adequate protection payments of $9000 with an additional monthly sum of $4,500 for taxes and to file their plans of reorganization and disclosure statements by March 4, 1992. The Court also adopted the appraisals of the court-appointed appraiser and found that the 164th Street property was worth $1,225,000, the 165th Street property was worth $1,365,000, and that neither Debtor had any equity in its respective property.

On March 4, 1992, the Debtors submitted to FNB informal proposals of reorganization plans which this Court refers to as "Plan 1"[1]. More formal plans ("Plan 2") were submitted to FNB on March 12, 1992. Following a hearing held on March 12, 1992, the Court on April 1, 1992, directed the Debtors: (1) to deliver to counsel for FNB, Weinstein I and Weinstein II, revised plans of reorganization ("Plan 3"), accompanied by disclosure statements by noon of March 31, 1992; (2) to make adequate protection payments monthly to FNB in the sum of $9,000 along with escrow payments of $6,142.34 for 164th Street and $4,831.42 for 165th Street covering the monthly portion of real estate taxes, water and sewer charges for the property; (3) to deliver checks representing the difference between the monthly escrow payment for February and March 1992 and the amount of the actual payment; (4) to obtain an order by July 13, 1992, confirming each plan of reorganization; and (5) to commence paying full debt service on the outstanding mortgages held by FNB from August, 1992, and each month thereafter. The Court also set April 6, 1992, as a hearing date on which the Court would consider the approval of the disclosure statements as well as the other outstanding motions, including FNB's motion for relief from the stay. In the event of a default by a Debtor, FNB would be entitled to immediately seek a sale of the respective property free and clear of liens pursuant to §§ 363(f) and 105 of the Bankruptcy Code notwithstanding any objection by the Debtor to such a sale.

FNB and Weinstein filed their objections to the Debtors' Plan 3. At a hearing held on April 6, 1992, this Court noted that each Plan 3 was not confirmable because each placed the undersecured claims of FNB and Weinstein in different classes from the other unsecured creditors. Even if that were corrected, the Debtors would be unable to obtain consent of the unsecured creditor class since the amount of FNB's unsecured claims substantially exceeded one-third of the total unsecured claims[2]. The Court then offered the Debtors one "last chance" to submit revised plans which could be confirmed, and briefs in support thereof. On May 11, 1992, the Debtors submitted formal plans ("Plan 4") and disclosure statements with the Court.

Each Plan 4 contemplated six different classes of creditors. On May 11, 1992, this Court declined to make any findings regarding the plans and ordered the parties to submit memoranda of law regarding the confirmability, or lack thereof, of each Plan 4. At the agreement of the parties, FNB stated that it would submit its briefs prior to the Debtors' submissions.

On June 3, 1992, FNB submitted a detailed memorandum of law in which it clearly and succinctly detailed its objections to the plans. When the Debtors submitted their briefs on July 6, 1992, they abandoned Plan 4 and instead submitted entirely new plans ("Plan 5"). In its reply briefs of July

---

**1.** For the purposes of this discussion, the Court will refer to the Debtors' plans of reorganization in numerical order based on their date of submission.

**2.** Under § 1126(c), a class of claims is deemed to accept a plan when more than one-half the number and at least two-thirds of the amount of the allowed claims vote in favor of the plan.

17, 1992, FNB for the first time addressed these newest plans of the Debtors.

On September 8, 1992, the Debtors filed their responses to FNB's reply briefs. This time the Debtors did not submit entirely new plans, but instead submitted entirely new numerical calculations ("Plan 6"). Therefore, this opinion will deal with each Debtor's Plan 6 inasmuch as this Court finds that the Debtors' continual rewriting and recalculations constitute an abandonment of any and all former plans. Thus, the provisions of "Plan 6" are intended to be referred to as "the plan" or "plans" as hereinafter discussed.

## DISCUSSION

Pursuant to § 362(d)(2), a court may grant relief from the automatic stay if:

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

The independent appraiser appointed by this Court assessed the value of the 164th Street property at $1,225,000 and the 165th Street property at $1,365,000. Accordingly, for the purpose of these proceedings, the Court adopts the valuations determined by the appraiser. Since FNB's claims against each building are in excess of $1.4 million, it is clear that each Debtor has no equity in its respective property.

■ While the lack of equity satisfies the first prong of § 362(d)(2), each Debtor may defeat the motions by showing the property is necessary for an effective reorganization. The Supreme Court has concluded that what is meant by this phrase is that there exists "a reasonable possibility of a successful reorganization within a reasonable time." *United States Ass'n v. Timbers of Inwood Forest Assoc. Ltd.*, 484 U.S. 365, 375–76, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988). To meet this burden, a debtor must prove that the proposed plan is not patently unconfirmable and that, in the near future, it has a realistic chance of being confirmed. *In re 266 Washington Assocs.*, 141 B.R. 275, 281 (Bankr.E.D.N.Y. 1992); *In re Ashgrove Apartments of De-Kalb County, Ltd.*, 121 B.R. 752, 756

(Bankr.S.D.Ohio 1990); *In re Marston Enter., Inc.*, 13 B.R. 514, 515 (Bankr.E.D.N.Y. 1981).

In order to determine confirmability, the Debtors' plans must be scrutinized. As structured by each Debtor, the plan bifurcates FNB's claims into a secured and unsecured claim. The secured portion is to be repaid at 9% interest over 13 years. FNB's unsecured claim will be paid 3% of the principal on confirmation and 3% thereafter for nine years with a balloon payment at the end of the tenth year following confirmation. As for the claims of Weinstein I and II, inasmuch as there is no equity in the properties, the Debtors propose to treat both claims as unsecured and to repay them in the same manner as FNB's unsecured claim. The remaining unsecured trade creditors will receive 3% of their claims on confirmation. The Debtors allege that the unsecured creditors plan to vote in favor of the plans. Weinstein, which was initially opposed to the Debtors' plans, has also indicated that it will vote in favor of the plans.

The Debtors argue that the *unsecured* claims of FNB and Weinstein are not impaired since they are being paid in full. According to the Debtors, the only impaired class is that of the trade creditors. The Debtors contend that they may group FNB's and Weinsteins' unsecured claims separate from that of the trade creditors. Therefore, since the trade creditors are in an impaired class which would vote to accept the plan, the Debtors claim that the plans are confirmable.

## I. § 1124—Impairment

■ Section 1124 of the Bankruptcy Code states in relevant part, that:

... a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—

(1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest;

(2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default-

(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title;

(B) reinstates the maturity of such claim or interest as such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and

(D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or

(3) provides that, on the effective date of the plan, the holder of such claim or interest receives, on account of such claim or interest, cash equal to-

(A) with respect to a claim, the allowed amount of such claim....

Each plan seeks to: (1) extend the maturity date of the obligation owed to FNB by three years; (2) to change the contract rate of interest on the secured portion from a floating rate to a flat 9% per annum; and (3) to pay interest on the unsecured portion at 3% per annum with no provision for the curing of arrearages or the reinstatement of the note. Notwithstanding the Debtors' contentions to the contrary, it is clear that FNB's claims are impaired within the meaning of § 1124(2)(D). Furthermore, since the plans do not propose to pay FNB the amount of its claims in cash on the effective date of each plan, FNB is also impaired under § 1124(3)(A). Weinstein's claims are likewise impaired as they are not receiving the full amount of their claims on the effective date of the plan.

**3.** Section 1111(b) allows a partially secured creditor to elect to have its entire claim treated

## II. § 1111(b)—Election to be Deemed a Fully Secured Claim

The Debtors contend that by fully paying FNB's and Weinstein's claims, the claims are rendered secured. However, an analysis of the plans clearly reflects that FNB is treated only in part as a secured creditor and in part as an unsecured creditor with Weinstein being treated solely as an unsecured creditor. In classifying FNB and Weinstein as fully secured claimants, the Debtors misread the applicable bankruptcy law. Essentially, each Debtor is attempting to make an § 1111(b) [3] election on behalf of FNB, without FNB's consent.

Section 506(a) states in relevant part, that:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim.

Having adopted the appraisal value of $1,225,000 for 164th Street and $1,365,000 for 165th Street, the amount of FNB's claim in excess of the appraisal is an unsecured claim under § 506(a). To treat the undersecured claim as a secured claim as the Debtors seek, an election must be made under § 1111(b). It is abundantly clear that it is the Debtor who is making the election to treat FNB's claims as fully secured. The law is equally abundantly clear that such a choice belongs only to the creditor. *In re Greystone III Joint Venture,* 948 F.2d 134, 140 (5th Cir.1991), *withdrawn in part, reinstated in part on reh'g* (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992); *266 Washington Assocs.,* 141 B.R. at 285–87.

## III. § 1122—Classification

Section 1122 states:

(a) Except as provided in subsection (b) of this section, a plan may place a

as a secured claim.

claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

While the language of § 1122(a) does not explicitly forbid a debtor from drafting a plan which places substantially similar claims in different classes, courts generally agree that "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *Greystone III,* 948 F.2d at 139; *In re Bryson Properties, XVIII,* 961 F.2d 496, 502 (4th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992). *See, In re Holywell Corp.,* 913 F.2d 873, 880 (11th Cir.1990); *Hanson v. First Bank of South Dakota,* 828 F.2d 1310, 1313 (8th Cir.1987); *In re L.G. Salem Ltd. Partnership,* 140 B.R. 932, 935 (Bankr.D.Mass. 1992); *Piedmont Assocs. v. Cigna Property & Casualty Ins. Co.,* 132 B.R. 75, 78 (N.D.Ga.1991); *In re Ward,* 89 B.R. 998, 1000–01 (Bankr.S.D.Fla.1988).

The Court can discern no other reason for separately classifying FNB's and Weinstein's unsecured claims save that FNB would be able to prevent acceptance and have the plan deemed rejected. This classification scheme simply cannot be tolerated. Where the unsecured deficiency claim of a lender dominates the unsecured class, it is wrong to separately classify the unsecured deficiency claim. *See, Hanson,* 828 F.2d at 1313; *In re Boston Post Road Ltd. Partnership,* 145 B.R. 745 (Bankr. D.Conn.1992); *266 Washington Assocs.,* 141 B.R. at 286–87; *In re Stoneridge Apartments,* 125 B.R. 794, 796 (Bankr. W.D.Mo.1991). *See also, In re Meadow Glen, Ltd.,* 87 B.R. 421, 426–27 (Bankr.W.D.Texas 1988) (when general unsecured and deficiency claims are split, the voice given the deficiency is taken away); *Piedmont Assocs.,* 132 B.R. at 78 (debtor's reasons for separate classification of the deficiency claim "support [the lend-

ers] arguments that Piedmont's plan was created with the intent of preventing [the lender] from having any active voice in the proposed reorganization"). Therefore, the unsecured claims of FNB and Weinstein must be considered with the claims of the other unsecured creditors.

## IV. § 1129(a)—Confirmation

As noted, the § 1111(b) election rests solely in the hands of the creditor. Furthermore, it is clear that FNB is impaired under the plans and that the Debtors have failed to present any legitimate reason for excluding FNB and Weinstein from the unsecured class in which all other unsecured claims are placed by the plans. Therefore, each plan must satisfy § 1129(a)(8) which provides:

(a) The court shall confirm a plan only if all of the following requirements are met:

(8) With respect to each class of claims or interest-

(A) such class has accepted the plan; or

(B) such class is not impaired under the plan.

In order for the plans to meet all requirements of confirmation under § 1129(a), they must also comply with § 1129(a)(10) which provides that if a class of claims is impaired under the plan, at least one class that is so impaired must vote to accept the plan. As previously noted, a class of claims is deemed to accept a plan under § 1126(c) when more than one-half the number and at least two-thirds of the amount of the allowed claims vote in favor of the plan. The Debtors allege that the unsecured trade creditors and Weinstein, all of whose claims are impaired, meet the requirements of § 1126(c) and therefore, an impaired class will be deemed to have accepted the plans.

## V. The Plan as it Affects 164th Street

The plan lists FNB's total claim as $1,755,000 with an unsecured portion of $530,000. The Debtor proposes to reduce the unsecured claim by $63,000 represent-

ing the amount of adequate protection payments made during the course of these proceedings and by another $20,000 representing a credit for insurance payments made by the Debtor. As calculated by the Debtor, the unsecured portion of FNB's claim would be approximately $447,000.

The Plan also lists the Weinstein I unsecured claim at $575,000 with an additional $207,000 representing interest and late charges from January, 1990, until the petition date. Unsecured trade claims total $142,000. Under this scenario, the Debtor argues that Weinstein I and the other unsecured creditors total an amount of approximately 67%, thus meeting the statutory requirements of 66 and ⅔%.

■ The Court finds that the methods which the Debtor used to arrive at the 67% figure are error-ridden and flawed. The Debtor apparently miscalculated the outstanding claim of Weinstein I at $782,000. Previously in its Plans 4 and 5, the Debtor had characterized the entire unsecured class excluding FNB's unsecured claim, as approximating $718,000. Throughout Plan 6, the Debtor continuously refers to Weinstein I's total claim being $717,000. Assuming that $717,000 is the correct figure, FNB controls 34.2% of the class which effectively prevents the unsecured class from being deemed to have accepted the plan under § 1126(c).

Upon closer examination, it appears that the $717,000 attributed to Weinstein I is also in error. The principal amount of Weinstein I's claim is only $500,000, not $575,000 as the Debtor claims. Weinstein I's own attorney submitted papers to the Court showing the Promissory Note to be in the principal sum of $500,000. According to him, the interest thereon is approximately $203,000 [4]. In this scenario, FNB controls 34.6% of the class and again prevents the class from being deemed to have accepted the plan.

■ 164th Street also seeks to credit insurance payments against the unsecured portion of FNB's claim. FNB claims that the reduction is improper since the Debtor failed to provide FNB with any proof of its insurance coverage as directed by this Court. Had the Debtor done so, FNB claims that FNB could have obtained a refund of insurance payments it made to protect the property. Since no proof of insurance coverage was presented by the Debtors, this Court holds that 164th Street is not entitled to offset FNB's claims and thus the alleged insurance payments should not be allowed.

As previously noted, the Debtor seeks to credit the adequate protection payments made to the unsecured portion of FNB's claim. According to the Debtor, it has made adequate protection payments aggregating $63,000. On the other hand, FNB disputes that figure and instead claims that only $54,000 has been paid.

■ Regardless of the actual amount paid, this Court holds that the credit of adequate protection payments to the unsecured portion of FNB's claim is not permissible. The few cases discussing the application of adequate protection payments to undersecured claims generally support the proposition that, to the extent such payments exceed the decrease in value of the collateral, they should be applied to reduce the *secured portion* of the claim. *In re Spacek*, 112 B.R. 162 (Bankr.W.D.Tex. 1990); *In re Maun*, 95 B.R. 94 (Bankr. S.D.Ill.1989); *In re Sherwood Square Assocs.*, 87 B.R. 388 (Bankr.D.Md.1988); *In re Kain*, 86 B.R. 506 (Bankr.W.D.Mich.1988); *In re Canaveral Seafoods, Inc.*, 79 B.R. 57 (Bankr.M.D.Fla.1987).

As noted in *In re Spacek*, it is simply not possible to apply the adequate protection payments to the unsecured portion of a debt as that would be an unauthorized transfer under § 549 [5] and in violation of the prohibition against paying unsecured

---

**4.** Originally, Weinstein I's attorney claimed that the interest due his client totalled $38,000. However, after conversations with the Debtor's attorney, this figure was soon changed to $203,-000 to reflect a penalty interest rate of 24%.

**5.** Section 549 allows a trustee in avoid postpetition transfers made after the commencement of the case.

creditors in a reorganization other than through a plan. 112 B.R. at 165. Otherwise, debtors would simply bide their time in the bankruptcy courts until adequate protection payments reduced the unsecured claim of a dissenting creditor to a level at which other unsecured creditors could control the class. Clearly, this is unacceptable and anathema to the spirit and principles of the Bankruptcy Code. Therefore, this Court holds that the adequate protection payments made to FNB can not be used to reduce FNB's unsecured claim.

From all of the foregoing, FNB's unsecured claim can be no less than $510,000. In order to accept the plan over FNB's objection, there must be other unsecured creditors whose claims are in excess of $1,020,153. Even examining the numbers in the best light possible for the Debtor, no plan can be accepted over the objection of FNB as the aggregate total of $924,000 [6] is still far short of the $1,020,153 needed for the impaired class to be deemed to accept the plan.

## VI. The Plan as it Affects 165th Street

■ In its plan, 165th Street seeks to reduce the $435,000 unsecured claim of FNB by approximately $81,000 representing both past and future adequate protection payments. As noted previously, adequate protection payments cannot be credited to the unsecured portion of an undersecured creditor's claim. Additionally, the plan provides for a payment of up to $35,000 to FNB for the purpose of reducing FNB's claim to less than one-third of the total unsecured claims. However, this payment offered only to FNB can not be allowed as it violates § 1123(a)(4) which states that a plan must provide the same treatment for claims within the same class. Using the Debtor's own figures, FNB's unsecured claim must therefore total $435,000.

Once again, the Debtor seems to have problems calculating the Weinstein II claim. In its plan, the Debtor lists the Weinstein II claim as being $400,000 with an additional $178,000 in interest. However, papers submitted by Weinstein II's attorney showed the principal to be $475,000 with a second note in the principal amount of $95,000. Including interest charges of $118,242, Weinstein II's attorney calculated the total unsecured claim as $688,242.

In this scenario, the unsecured claims of FNB, Weinstein II and the other unsecured creditors, total $1,273,242. FNB's claim of $435,000 represents 34.16% of the class which blocks the class from being deemed to have accepted the plan. Furthermore, FNB disputes 165th Street's calculations and instead asserts that its total claim is $1,841,293 which leaves a deficiency claim of $476,300 representing 36.2% of the unsecured class. In any event, it is clear that FNB's vote prevents the class from being deemed to have accepted the plan.

## CONCLUSION

In examining the present as well as the previous plans of the Debtors, the Court observes that classification schemes in each plan are nothing more than an attempt to gerrymander or concoct an impaired class such that the plans could be deemed accepted. Since no credible reason exists for the separation, the unsecured claims of FNB and Weinstein must be included in the same class as the other unsecured claimants.

■ In terms of each Debtor's Plan 6, the Court finds that FNB's deficiency claim is large enough to control the class of unsecured creditors. FNB has indicated that it will not vote in favor of Plan 6 which is the plan submitted for consideration by this Court. Given FNB's stance, it is this Court's conclusion that Plan 6 can not be confirmed. Therefore, FNB's motions for relief from the stay in both 164th and 165th Street are hereby granted. With respect to Weinstein II's motion for relief from the stay in 165th Street, in light of the fact there is no equity in 165th Street, Weinstein II's claim in that case is deemed

---

**6.** Excluding FNB, the other unsecured creditors total $924,000. Assuming Weinstein I's claim totals $782,000, when coupled with the $142,000 of other unsecured trade creditors, the total is $924,000.

unsecured and the stay of § 362 which enjoined Weinstein II from seeking to enforce its rights as against the Debtor and or, the 165th Street property, is hereby modified so as to permit it to enforce whatever rights it may have.

 Under §§ 105(a), 1112(b)(2) and (3), a bankruptcy court may dismiss a case sua sponte if a debtor is unable to effectuate a plan or if there is unreasonable delay that is prejudicial to creditors. *See, In re Great American Pyramid Joint Venture*, 144 B.R. 780, 789–90 (Bankr.W.D.Tenn. 1992) (bankruptcy court may, under § 105(a), convert or dismiss a case sua sponte even though § 1112(b) explicitly requires that the request be made by a party in interest); *266 Washington Assocs.*, 141 B.R. at 288–89 (absence of a request by a party in interest is not an impediment to a bankruptcy court's authority to sua sponte dismiss a case pursuant to § 105(a)). It is undisputed that FNB will not vote for any reorganization plan proposed by either Debtor. Thus, neither Debtor is capable of effectuating a confirmable plan without improperly classifying creditors. In such situations, a bankruptcy court may dismiss the case. *In re Lumber Exch. Bldg. Ltd. Partnership*, 968 F.2d 647, 650 (8th Cir. 1992); *266 Washington Assocs.*, 141 B.R. at 288. Further, FNB alleges that the continuation of these proceedings serves only to delay FNB from enforcing its rights and will lead to further declines in the value of its collateral as New York City is in the process of assessing repair liens in excess of $30,000 against each property. Creditors, like debtors, are entitled to some measure of finality in bankruptcy proceedings. *In re Turchon*, 62 B.R. 461, 465 (Bankr.E.D.N.Y.1986). Therefore, in the interests of finality, this Court dismisses the cases of B & B West 164th Street and B & B West 165th Street pursuant to §§ 105(a), 1112(b)(2) and 1112(b)(3).

SUBMIT AN ORDER CONSISTENT WITH THIS OPINION.