**In re EASTLAND PARTNERS LIMITED PARTNERSHIP, Debtor.**

**Bankruptcy No. 91–03149–R.**

United States Bankruptcy Court,
E.D. Michigan.

Dec. 10, 1992.

Phillip Shefferly, Southfield, MI, for debtor.

Michael Vartanian, Detroit, MI, for creditor.

## SUPPLEMENTAL OPINION

STEVEN W. RHODES, Bankruptcy Judge.

### I.

This opinion supplements the bench decision this Court gave on September 16, 1992 confirming the plan of reorganization proposed by Eastland Partners Limited Partnership, the debtor. Prudential Insurance Company of America (Prudential), the secured creditor in the case, filed several objections to confirmation of the plan, two of which remain at issue. The first objection is that the interest rate proposed by the debtor's plan is insufficient under § 1129(b)(2)(A) of the Bankruptcy Code, 11

U.S.C. §§ 101–1330 (1989). The second objection is that the debtor's plan is not feasible as required by § 1129(a)(11).

Prudential loaned the debtor $19,500,000 in 1986. The loan is secured by a first mortgage on Eastland's primary asset, Eastland Village Apartments, located in Harper Woods, Michigan. The parties agree that the property is worth approximately $23 million. Prudential's claim is now for over $21 million. The debtor filed its Chapter 11 petition on March 21, 1991 because it could not meet both its loan payments to Prudential and its property tax obligations. Over the course of this Chapter 11, the debtor-in-possession has substantially improved the apartment complex by painting the exteriors of the apartments; repaving the parking area; repainting and reroofing the carports; replacing the sidewalks and light fixtures; replacing the carpet, wallpaper and light fixtures in the common areas; and replacing 80% of the appliances in the apartments.

## II.

The debtor's plan proposes to pay an interest rate of 8.75% on Prudential's claim for the first five years, and then 9.5% for the sixth and seventh years. The evidence indicates that the weighted average of these interest rates is approximately 8.96%. The plan further proposes to make monthly payments to Prudential on a 30 year amortization schedule and to pay the balance due to Prudential in full by the year 1999. Prudential contends that it will not receive amounts equal to the present value of the property under the plan because the current market rate of interest for similar loans is 9.5% or greater.

## A.

■ The parties agree that the issue is whether the interest offered by the plan is the current market rate of interest used for similar loans in the region, as called for by the Sixth Circuit case of *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427 (6th Cir.1982). It is recognized, of course, that the *Memphis Bank & Trust Co.* case was a Chapter 13 case, but the parties have agreed that this standard applies in Chapter 11. The Court agrees, in light of the similarity of the statutory language. *See also In re Memphis Partners, L.P.*, 99 B.R. 385, 387 (Bankr.M.D.Tenn.1989). Therefore, the Court must determine what the current market rate for similar loans is.

■ The parties agree that there is essentially no current market for similar loans. The evidence establishes that although lenders are quoting rates, there are almost no similar real estate loans actually being made. Certainly no loan is available considering the risk factors associated with this transaction arising from the debt service ratio, the loan to value ratio, and indeed the debtor's Chapter 11 filing. Prudential argues that because no reasonable lender would make the proposed loan to this debtor, no market rate of interest exists, and no plan providing for a "forced loan" can be confirmed. It cites *In re Oxford Square Investors, L.P.*, No. 90–13148 (Bankr.D.Kan., Mar. 4, 1992).

This Court rejects that position for several reasons. First, it is contrary to the great weight of authority. *See, e.g., In re Bryson Properties XVIII*, 961 F.2d 496 (4th Cir.), *cert. denied sub nom. Bryson Properties, XVIII v. Travelers Ins. Co.*, — U.S. —, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992); *In re Aztec Co.*, 107 B.R. 585 (Bankr.M.D.Tenn.1989); *In re Oaks Partners Ltd.*, 135 B.R. 440 (Bankr.N.D.Ga. 1991).

Second, to deny confirmation just because there is no market for similar loans would give the market permission to repeal § 1129(b)(2) of the Bankruptcy Code. Stated another way, if there were indeed a market for the debtor to access for such a loan, then § 1129(b)(2) would not be needed. The Court cannot conclude that Congress intended for § 1129(b)(2) to be interpreted such that it never applies.

## B.

■ The question then becomes: How does the Court go about setting or finding the appropriate market rate? The evidence establishes that one appropriate way is

first to determine the "risk free" rate, and then increase the rate by a certain factor to compensate the lender for the risk associated with the loan. The approach has support in a number of prior decisions. *See, e.g., United States v. Doud,* 869 F.2d 1144 (8th Cir.1989); *In re Aztec Co.,* 99 B.R. 388 (Bankr.M.D.Tenn.1989). The parties appear to agree to this approach, though not to its specific application in this case. This Court agrees that such an approach is appropriate and will adopt it in this case.

■ First the Court must determine the appropriate risk-free rate. The parties agree to use the Treasury Bill rate to establish a risk-free rate, and the cases support use of such evidence. At times the debtor has suggested using a five year rate, but the Court concludes that it is appropriate to use a seven year Treasury Bill rate because the plan proposes to pay this secured creditor over seven years. The evidence establishes that the seven year Treasury Bill rate as of this date is 5.86%. *Key Rates,* N.Y. Times, Sept. 16, 1992, at C15. The Court will round this for ease of calculation and discussion to 5.9%.

The Court notes that the rate declined between the evidentiary hearings in this matter and confirmation. The Court concludes that the Treasury Bill rate as of this date is the appropriate rate to use in the analysis. *Aztec,* 99 B.R. at 392.

Next, the Court faces the more difficult challenge of determining how many basis points to add to the risk free rate to compensate for the risk factors inherent in the "new loan." The debtor's plan offers an interest rate of 8.75% to 9.5% which is 285 to 360 basis points over the current Treasury Bill rate. The weighted average of 8.96% is 310 basis points over the current seven year Treasury Bill rate.

The debtor offered evidence from a real estate expert, Mr. Vendici, who testified that the market rate for loans on apartment complexes generally is about 175 to 250 basis points above the corresponding Treasury Bill rate, without considering the risks associated with underwriting factors such as the loan to value or debt services ratio of any particular loan. Prudential's

real estate expert, Mr. Bernard, indicated that lenders would offer a spread of 300 to 350 basis points. He looked primarily at the rates offered by institutions that lend to older apartment complexes, which he thought appropriate in light of the age of this apartment complex.

The cases arrive at a variety of interest rates applied in different circumstances with different kinds of properties. For example, in *In re Oaks Partners, Ltd.,* 135 B.R. 440 (Bankr.N.D.Ga.1991), a 3% risk factor was added despite the fact that the apartment complex was well managed, had 96% occupancy and was located in an improving market, because maintenance had been deferred during bankruptcy.

In *In re Computer Optics,* 126 B.R. 664 (Bankr.D.N.H.1991), the court approved an interest rate which equaled the contract rate, which was 4% over the Treasury Bill rate.

In *In re E.I. Parks No. I, Ltd. Partnership,* 122 B.R. 549 (Bankr.W.D.Ark.1990), the court approved a 2% risk factor because the property was not likely to decline in value.

In the *Aztec* case, 99 B.R. 388, the court approved a risk factor of 2% where the property was in poor condition and had a high vacancy rate.

In *In re Park Avenue Partners Ltd. Partnership,* 95 B.R. 605 (Bankr.E.D.Wis. 1988), the court approved a 5.5% risk factor because the plan provided for negative amortization of the loan and the apartment complex was only 81% occupied, had poor management and cash flow, and was in bad condition.

In *In re Crane Automotive, Inc.,* 88 B.R. 81 (Bankr.W.D.Pa.1988), the court approved an interest rate 1.3% over the Treasury Bill rate and 2% over the prime rate.

In *In re Noe,* 76 B.R. 675 (Bankr. N.D.Iowa 1987), the court approved a risk factor of 200 basis points where the debtor had a 30% equity cushion in farmland.

And finally in *In re Bartlesmeyer,* 78 B.R. 975 (Bankr.W.D.Mo.1987), the court approved an interest rate with a 1% risk

factor over the risk free rate, where the only risk was the possibility of the depreciation of the collateral.

After considering those cases and the evidence which was presented in this case, the Court concludes that the market rate range for a loan on this property, given its risk factors, including its age and its condition, including the recent improvements to the property, would be 275 to 300 basis points over the corresponding Treasury Bill rate. At present, this interest rate would be 8.6 to 8.9%. Accordingly, the Court concludes that the debtor has proposed an interest rate which is within the range of pertinent market rates, and is even at the high end of the range.

Accordingly, Prudential's objection to confirmation on this ground is overruled.

### III.

Prudential also objects to confirmation of the debtor's plan on the ground that it lacks feasibility. Prudential contends that the debtor will not be able to make the payments called for by the plan.

### A.

As a condition of confirmation, the Court must find that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).

■ The debtor bears the burden of proving by a preponderance of the evidence that the plan is not likely to fail. A number of courts have addressed the issue of the type of proof the debtor must provide. In *Kane v. Johns–Manville Corp.*, 843 F.2d 636, 649 (2nd Cir.1988), the court stated, "[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."

In *In re Monnier Brothers*, 755 F.2d 1336, 1341 (8th Cir.1985), the court stated that it must determine "whether [the plan] offers a reasonable prospect of success and is workable."

Another bankruptcy court has held:

> Where a Chapter 11 Plan contemplates funding the Plan payments from operating revenues, its past and present financial records are probative of feasibility. *In re Merrimack Valley Oil Company, Inc.*, 32 B.R. 485, 488 (Bankr.Mass.1983); *In re Northern Protective Services, Inc.*, 19 B.R. 802 (Bankr.W.D.Wash.1982). Speculative, conjectural, or unrealistic predictions cannot be used to predict financial progress. *Merrimack*, supra at 488, *In re Stuart Motel, Inc.*, 8 B.R. 48 (Bankr.S.D.Fla.1980). Factual support must be shown for the Debtor's projections. *In re Reilly*, 71 B.R. 132, 4 Mont. B.R. 150, 155 (Bankr.Mont.1987).

*In re Hobble–Diamond Cattle Co.*, 89 B.R. 856, 858 (Bankr.D.Mont.1988).

### B.

In the present case, the debtor's evidence of feasibility consisted of its financial projections, which were supported by evidence of the debtor's historical occupancy rates, historical rental rates, historical gross income and expenses, and market analysis. The debtor's evidence of the feasibility of its plan was also supported by its various witnesses.

Prudential challenges the feasibility of the plan on several grounds. Specifically, Prudential is concerned that the inflation factor used in the debtor's projections is inadequate, that the reserves for capital expenses are also inadequate, and that the occupancy and rental rates are exaggerated. Prudential is supported in its challenges to the debtor's plan by witnesses Grant and Bologna. If credited, Prudential's evidence would establish that the debtor's plan is not feasible, and that the debtor will not be able to pay all of its expenses and plan obligations.

■ After weighing the evidence, the Court concludes that the debtor has established by a preponderance of the evidence that the plan is likely to succeed, and that the debtor's projections are reasonably re-

alistic. The Court finds that the debtor's evidence is more credible because its witnesses appeared to be much more familiar with this particular property and because their judgments were based upon their specific knowledge of the property rather than upon generalized knowledge of industry norms.

For example, for the first several years of the plan's operation, the debtor proposes capital reserves below industry norms. This is a matter of substantial concern to Prudential. The Court concludes that the debtor's proposal for capital reserves below industry norms is entirely appropriate and realistic in light of the over $1,000,000 in improvements made by the debtor to this property during the Chapter 11, and also in light of the present condition of the property, as testified to by witnesses Lefkofski and Reimel. Industry norms can be a valuable source of information and a check upon the debtor's evidence, but when the debtor's evidence properly justifies a different level of reserves than industry norms would dictate, then the Court believes that the debtor's projections should be credited.

The Court further finds that the debtor's estimates regarding occupancy rates, rental rates, and expense inflator rates are realistic and consistent with its historical evidence, perhaps a bit on the conservative side. The debtor's estimates of these factors was also supported by credible evidence from witnesses Lutz, Unger and Bevy.

Finally, the Court must conclude that the debtor and Lutz have a viable exit strategy to pay off this loan within seven years. Certainly there is no guarantee, but it is reasonably likely that the debtor will be able to sell or refinance this property at or within that time, to pay off its debt to Prudential.

Accordingly, Prudential's objection on the grounds of feasibility is overruled.

The Court will enter an order confirming the plan.