**In re BIRDNECK APARTMENT ASSOCIATES, II, L.P., Debtor.**

**Bankruptcy No. 91–23164–T.**

United States Bankruptcy Court, E.D. Virginia, Norfolk Division.

May 12, 1993.

---

Frank J. Santoro, Marcus, Santoro & Kozak, Portsmouth, VA, for debtor.

David W. Elmquist, Richard J. Martin, Scott A. Fenske, Bradford F. Englander, Winstead Sechrest & Minick, P.C., Washington, DC, for Potomac Equity Portfolio L.P.

James Thomas Lloyd, Jr., Office of the U.S. Trustee, Norfolk, VA.

### MEMORANDUM OPINION

DOUGLAS O. TICE, Jr., Bankruptcy Judge.

This case comes before the court on hearing on confirmation of Birdneck Apartment Associates' ("debtor's") Amended Plan of Reorganization ("plan"). Debtor's sole asset is a 100–unit apartment complex known as Ashley Oaks Apartments. Potomac Equity Portfolio Limited Partnership, L.P. ("Potomac") is secured by a deed of trust on the property and a security interest in all revenues.

Potomac rejected the plan and objected to confirmation. Notwithstanding, debtor

seeks confirmation of its plan pursuant to the "cram down" provisions of 11 U.S.C. § 1129(b). A confirmation hearing was held on April 15, 16, and 19, 1993. At the conclusion of the hearing the court ruled from the bench pursuant to 11 U.S.C. § 506 that the value of the debtor's property was $2,900,000.00. The court took the remaining issues raised by 11 U.S.C. § 1129 under advisement to allow the parties to submit proposed findings of fact and conclusions of law.

For the reasons stated in this memorandum opinion the court must deny confirmation because debtor has not been able to satisfy 11 U.S.C. § 1129(a)(10), and the plan does not provide for fair and equitable treatment of Potomac's claim as required by 11 U.S.C. § 1129(b).[1]

### Findings of Fact

Debtor filed its chapter 11 petition on May 31, 1991. On February 20, 1992, the court held a final hearing on a motion for relief from stay filed by NationsBank (f/k/a "Sovran"), Potomac's predecessor in interest.[2] The court denied the motion conditioned in part upon debtor achieving confirmation by May 20, 1992. If confirmation was not achieved by May 20, 1992, NationsBank would have automatic relief from stay without further order of court.

Debtor filed an amended plan in August 1992, and the court subsequently entered a confirmation order on November 5, 1992. However, the court vacated the November 5, 1992, confirmation order for reasons stated in a previous memorandum opinion. *Potomac Equity Portfolio Limited Partnership v. Birdneck Apartment Associates, II, L.P. (Birdneck Apartment Associates, II, L.P. )*, 152 B.R. 65 (Bankr.E.D.Va. 1993).[3]

After the court vacated the November 5, 1992, confirmation order the debtor filed a complaint on March 12, 1993, asking for

---

**1.** The court's memorandum opinion focuses on these two provisions of § 1129. Pertinent but ancillary issues will be discussed only in the margin.

**2.** NationsBank transferred its claim to Potomac. However, neither entity has filed a proof of claim.

**3.** The debtor retained new counsel, Frank J. Santoro, Esq., for the hearing to vacate the confirmation order because debtor's previous counsel was required to testify. Mr. Santoro did not represent the debtor prior to January 1993.

injunctive relief to prevent Potomac from foreclosing on the property. *Birdneck Apartment Associates, II, L.P. v. Potomac Equity Portfolio Limited Partnership (In re Birdneck Apartment Associates, II, L.P.),* 152 B.R. 65 (Bkrtcy.E.D.Va.1993).

Under the terms of the February 20, 1992, relief from stay ruling Potomac had automatic relief from stay since debtor failed to achieve confirmation by May 20, 1992. Hearing was held on debtor's complaint on March 16, 1993, and the court concluded that Potomac should be temporarily enjoined until the confirmation hearing set for April 15, 1993.

Debtor's sole asset is a 100–unit apartment complex in Virginia Beach, Virginia, known as Ashley Oaks Apartments. United Property Associates ("UPA") is the management company that runs the day-to-day operations of the debtor and would likely continue managing the property post-confirmation.[4] Debtor's plan of reorganization proposes to treat Potomac's claim as fully secured. The plan provides for the payment of Potomac's claim in full on a 30–year amortization schedule with interest at a rate of 8.25 percent per annum; Potomac is given the right to call the full debt at the end of seven years.

There are only four classes of creditors provided for in the plan and only one creditor in each class:

CLASS 1: ★ REAL ESTATE TAXES
★ CITY OF VIRGINIA BEACH
★ ESTIMATED CLAIM: $153,000.00

CLASS 2: ★ ALLOWED SECURED CLAIMS
★ POTOMAC
★ ESTIMATED CLAIM: $3,051,000.00

CLASS 3: ★ ALLOWED UNSECURED CLAIMS
★ FLAIR AZALEA APARTMENT ASSOCIATES [5]
★ ESTIMATED CLAIM: $113,000.00

CLASS 4: ★ HOLDERS OF INTEREST IN DEBTOR [6]

**4.** United Property Associates is owned by Bernie J. Grablowsky (50%) and L.B. Reavis (50%), both general partners of the debtor. Grablowsky is the president of UPA and is paid a salary by UPA of approximately $3,000.00 per month. UPA also employs Grablowsky's wife and daughter.

**5.** The general partners of Flair Azalea Apartment Associates and their respective partnership interests in Flair Azalea are:

Bernie J. Grablowsky ............... 33.33%
Vincent Olivieri ..................... 33.33%
L.B. Reavis ........................ 33.33%

*See* Debtor's Exhibit 1.

The court previously ruled that Flair Azalea was not an "insider" disqualified to vote under 11 U.S.C. § 1129(a)(10). Grablowsky testified that his partners orally authorized him to be the designated representative of Flair Azalea. Grablowsky submitted a ballot on behalf of Flair Azalea accepting the plan, apparently on April 9, 1993. *See* Debtor's Exhibit 11. However, pursuant to Bankruptcy Rule 3017(c) the court set April 5, 1993, as the last day to file written acceptances or rejection of the plan. Although "the consideration of ballots cast *after* an election is the very antithesis of a democratic election," *In re Townco Realty, Inc.,* 81 B.R. 707, 709 (Bankr.S.D.Fla.1987) (emphasis in original), I am unwilling to disqualify Flair Azalea's vote in this case because Potomac had full knowledge of Flair Azalea's alleged status and its intention to accept the plan.

**6.** The general partners of the debtor and their partnership interests in the debtor are:

Bernie J. Grablowsky .............. 15.993%
Vincent Olivieri .................... 15.993%
Thomas Kapsha .................... 15.993%
L.B. Reavis ........................ 31.986%

*See* Debtor's Exhibits 12–16.

Grablowsky testified that his partners in the debtor also orally authorized him to be its designated representative. Grablowsky and Reavis have both filed personal bankruptcy cases with this court, and it is unclear whether they would be general partners in the reorganized debtor if the plan is confirmed. This uncertainty arguably violates the disclosure provisions of 11 U.S.C. §§ 1123(a)(7) and 1129(a)(5). However, because the court denies confirmation for other reasons it is unnecessary for the court to consider this basis for denying confirmation.

Class 1, the City of Virginia Beach, originally voted to reject the plan, but rescinded its ballot after negotiating a settlement with the debtor prior to hearing on confirmation.

Class 2, Potomac, voted to reject the plan. Potomac's ballot states:

> The undersigned, a creditor of the above-named debtor in the unpaid principal amount of $2,974,157.49, plus such other amounts as may be allowable under the Bankruptcy Code as secured and unsecured claims
>
> (     )   Accepts
> ( XXX )   Rejects
>
> the plan for the reorganization of the above named debtor.

*See* Debtor's Exhibit 9 (emphasis added).

Class 3, Flair Azalea Apartment Associates, voted to accept the plan of reorganization. Class 3 is impaired under the plan.

Class 4, the general and limited partners of the debtor, unanimously accepted the plan.

At confirmation substantial expert testimony was presented regarding the value of debtor's property in order for the court to rule on the extent of Potomac's secured status pursuant 11 U.S.C. § 506. Debtor's expert valued the property at $3,100,000.00 and Potomac's expert valued the property at $2,900,000.00. On the question of value the court essentially adopted the appraisal of Potomac's expert who valued the property at $2,900,000.00.[7]

In the debtor's pro-forma annual operating statement the amount of the debt owed to Potomac is stated as $3,085,360.00. However, testimony at hearing reflected the amount of Potomac's debt is approximately $3,051,000.00. There are also unpaid real estate taxes due and owing as of April 7, 1993, in the approximate amount of $153,000.00, and an additional $16,605.16 in real estate taxes have been assessed and will be due on June 5, 1993.[8] Accordingly, Potomac is an undersecured creditor in this case:

| | | |
|---|---|---|
| | PRIORITY TAX LIEN | $ 153,000.00 |
| (+) | POTOMAC'S DEBT | $3,051,000.00 |
| (=) | TOTAL DEBT | $3,204,000.00 |
| (−) | VALUE OF PROPERTY | $2,900,000.00 |
| (=) | **AMOUNT UNDERSECURED** | **$ 304,000.00** |

Expert testimony was also presented on whether the proposed 8.25 percent interest rate was "fair and equitable" as required by 11 U.S.C. § 1129(b). Based upon this evidence, the court finds that at least a 10 percent interest rate on Potomac's claim is required to satisfy the fair and equitable standard in 11 U.S.C. § 1129(b).[9]

---

Potomac has also raised several questions involving Virginia Partnership law that cast doubt on Grablowsky's authority to act on behalf of this debtor. These issues are admittedly troubling, but because the court denies confirmation for other reasons it is unnecessary to address these issues at this time.

7. Potomac's appraiser also testified for Nations-Bank at the February 20, 1992, relief from stay hearing that the value of the property was $2,800,00.00. At that hearing I adopted a $2,800,000.00 valuation in accordance with his January 16, 1992, appraisal. Since that hearing and before the current April 5, 1993, appraisal this same expert appraised the property on September 29, 1992, at $2,800,000.00. Although these previous appraisals are not binding for the purposes of "cram down" on confirmation, *see* 11 U.S.C. § 506 (advisory committee's note), these appraisals are probative and enhance the reliability of Potomac's current $2,900,000.00 valuation.

In my view Potomac's appraisal has more realistic projections of likely rent increases, vacancy rates, and lease defaults. Moreover, Potomac's witness excluded from the definition of "other income" revenues from lease defaults, late fees, and security deposit forfeitures. Although exclusion of these items from the definition of "other income" may not be universally accepted in the industry, it seems to be an increasingly accepted standard. It also has a common sense appeal since a high rate of lease defaults is a typical sign of imprudent management. Thus, to include this revenue as an increase in value seems to conflict with another important aspect of value, prudent management.

8. Under § 58.1–3340 of the Virginia Code unpaid real estate taxes constitute a priority lien encumbering the real estate.

9. For a detailed discussion of the testimony of the interest rate experts see Appendix A.

## Position of Parties

### DEBTOR.

Debtor argues that all of the necessary requirements of 11 U.S.C. § 1129(a) & (b) have been satisfied to confirm debtor's plan over the objection of Potomac.

Debtor argues that Potomac is appropriately treated as fully secured under the plan, and to the extent the court finds Potomac undersecured Potomac has essentially waived its right to vote as an unsecured creditor because it did not file a proof of claim for its unsecured claim pursuant to Bankruptcy Rule 3003(c)(2). Basically, debtor argues that Potomac has made its 1111(b)(2) election by default.

### POTOMAC.

Potomac has made extensive arguments against confirmation based on several provision of 11 U.S.C. § 1129. However, the court limits its discussion to two issues. Potomac argues it is undersecured by as much as $300,000.00 and that pursuant to 11 U.S.C. § 506 and 11 U.S.C. § 1111(b) it is entitled to vote as an unsecured creditor in class 3. By voting to reject the plan Potomac would block class 3 acceptance, and the debtor would not be able to satisfy 11 U.S.C. § 1129(a)(10) because no impaired class has accepted the plan. Therefore, confirmation must be denied as a matter of law.

Potomac also argues the plan is not fair and equitable pursuant under 11 U.S.C. § 1129(b) because the interest rate proposed to be paid on Potomac's claim is not a market rate of interest for like terms, collateral, and risk.

## Discussion and Conclusions of Law

Although Potomac argues that confirmation must be denied under virtually every provision of § 1129, the court finds it necessary to consider just two issues which in my view plainly require the denial of confirmation: (1) debtor has failed to obtain acceptance of the plan by an impaired class pursuant to § 1129(a)(10), and (2) the rate of interest proposed to be paid on Potomac's secured claim is not fair and equitable as required by § 1129(b).

### 11 U.S.C. § 1129(a)(10).

Before a plan of reorganization can be confirmed pursuant to § 1129(b) all of the provisions of § 1129(a) must be satisfied with the exception of subsection (a)(8).

Section 1129(a)(10) requires that:

If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan ...

In this case, according to debtor, only class 3, allowed unsecured claims, is an impaired class. *See* 11 U.S.C. § 1124. Debtor's position is that only Flair Azalea's claim of $113,000.00 is impaired, and this creditor has voted to accept the plan.

However, the court has found that Potomac is an undersecured creditor by as much as $304,000.00. Potomac argues that it has not made an election pursuant to § 1111(b) to be treated as fully secured, and therefore it must be allowed to vote its unsecured claim in class 3. There is no question but that Potomac's negative vote in class 3 would preclude confirmation of the debtor's plan.[10]

Debtor's position that Potomac is not entitled to a vote in class 3 has two aspects. Its first argument is that Poto-

---

**10.** A class accepts a plan if at least two-thirds in amount and more than one-half in number of the allowed claims of such class accept the plan. 11 U.S.C. § 1126(c). Potomac's class 3 rejection prevents class 3 from accepting the plan.

Notwithstanding the exact amount of Potomac's unsecured claim, if Potomac has any undersecured claim class 3 cannot accept the plan because "more than one-half in number of the allowed claims in such class" must accept before the class is deemed to have accepted the plan. 11 U.S.C. § 1126(c). If Potomac has an unsecured claim, regardless of amount, class 3 cannot accept the plan because there would be only two claims in class 3. If there are only two claims it is impossible for "more than one-half of the claims" to accept.

Debtor has not argued, nor does the court find any basis to separately classify Potomac's unsecured claim. *See Travelers Ins. Co. v. Bryson Properties XVIII (In re Bryson Properties XVIII)*, 961 F.2d 496 (4th Cir.1992); *In re 499 W. Warren Street Associates, Ltd.*, 151 B.R. 307 (Bankr.N.D.N.Y.1992).

mac's claim is not undersecured even in light of the court's factual determination that the real property has a value of $2,900,000.00. Debtor argues that monthly postpetition payments totaling $438,191.57 paid by debtor to NationsBank and then Potomac pursuant to a cash collateral order have been inappropriately applied to interest on Potomac's claim and should have been applied to reduce principal. *See e.g., In re Oaks Partners, Ltd.*, 135 B.R. 440 (Bankr.N.D.Ga.1991). Alternatively, debtor would have this sum added to the value of the collateral which would in theory render Potomac oversecured. *See e.g., In re Landing Associates, Ltd.*, 122 B.R. 288 (Bankr.W.D.Tex.1990). I disagree with both of debtor's alternatives.

Debtor ignores the fact that Potomac, as successor in interest to NationsBank, has a continuing perfected postpetition security interest in rents, and that all revenues of the debtor constitute Potomac's cash collateral. The Supreme Court's decision in *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), prohibits payments to undersecured creditors only from "unencumbered" assets where there is no evidence of decline in collateral value. Debtor's argument interprets *Timbers* too broadly and reads § 552(b) out of the Code.

Debtor cites *In re Oaks Partners, Ltd.*, 135 B.R. 440, 447 (Bankr.N.D.Ga.1991), to support its position that its postpetition payments should have been applied to reduce Potomac's principal. However, the postpetition payments made in *In re Oaks Partners* were made pursuant to an ambiguous consent order silent on how the payments were to be applied. *In re Oaks*

*Partners*, 135 B.R. at 441; *see also In the Matter of IPC Atlanta Limited Partnership*, 142 B.R. 547, 559 (Bankr.N.D.Ga. 1992). The opposite is true here.

In this case a contested cash collateral hearing was held on July 2, 1991. Before allowing the debtor to use cash collateral the court ordered the following as adequate protection: (1) the debtor must satisfying the monthly loan obligations pursuant to the terms of the loan documents, and (2) the bank was granted a continuing perfected postpetition lien on all revenues. Only then could debtor use cash collateral to pay monthly operating expenses.

Moreover, debtor's argument that any principal should have been curtailed by its postpetition payments to NationsBank under the court's order contradicts the position debtor's counsel argued at the cash collateral hearing:

> I don't think we are required to pay them their principal until we get to plan confirmation time. On an interest payment basis, we're showing ... a positive.... [W]hat I would propose is this.... [W]e pay these expenses and we remit the net income every month and where it falls it falls. If it falls paying interest only, it falls paying interest only. If it pays interest and a little principal, so be it. If it pays a little less than interest, so be it.... *I'm hopeful that if we get lucky we can maintain their interest current until we get to the plan confirmation....*

*See* Transcript of Proceedings (July 2, 1991) at 69–70 (emphasis added).

Debtor's attempt to re-characterize the adequate protection payments ordered by the court in this case is untenable.[11]

---

**11.** In cash collateral and relief from stay litigation when there is little or no equity in the subject collateral, this court often denies the creditor relief conditioned upon the chapter 11 debtor maintaining interest current on the debt as a form of adequate protection. To allow chapter 11 debtors to recharacterize this relief at confirmation would be contrary to the court's intention and wholly inequitable to the secured creditor.

I essentially agree with Judge Teel's reasoning in *In re Vermont Investment Limited Partnership* where he stated that:

> The position urged by the debtor would result in the application of the ... [creditor's] ... bargained for collateral to create an "equity cushion" from which the debtor might hope to reorganize. Aside from the obvious inequity of such a result, it would create a dramatic incentive for any secured creditor to bring a single asset reorganization case to a halt at the earliest possible moment, and would create similar incentive on the part of the debtors to delay the case as long as possible in order to reduce the amount of the creditor's

■ Moreover, even if the court were to accept debtor's alternative approach that the $438,191.57 represents additional collateral value it would be offset by Potomac's increased claim from postpetition interest accruals. *In re Vermont Investment Limited Partnership*, 142 B.R. 571, 573 (Bankr.D.C.1992); *In re Landing Associates, Ltd.*, 122 B.R. 288, 297 (Bankr. W.D.Tex.1990); *In re Flagler–At–First Associates, Ltd.*, 114 B.R. 297, 302 (Bankr. S.D.Fla.1990). The result would essentially be a "wash," and no reduction of Potomac's secured claim would be appropriate. *In re Vermont Investment Limited Partnership*, 142 B.R. 571, 573 (Bankr.D.C. 1992); *In re Flagler–At–First Associates, Ltd.*, 114 B.R. 297, 302 (Bankr.S.D.Fla. 1990).

Accordingly, I stand by my earlier stated finding that Potomac has an unsecured and impaired claim of up to $304,000.00.

■ The second aspect of debtor's position that Potomac cannot vote in class 3 concerns the plan treatment of Potomac's claim only as fully secured in class 2.

In a chapter 11 reorganization case, § 1111(b)(2) allows an undersecured claimant to elect to be treated as fully secured. A creditor who makes the § 1111(b)(2) election will be treated as "secured" to the full extent its claim, not just to the value of the underlying collateral as would otherwise be the case under § 506(a). *See* 3 David G. Epstein, *et al.*, Bankruptcy § 10–27 (1992).

Potomac's argument is that it did not file an election to be treated as fully secured under § 1111(b)(2), and therefore it must follow that Potomac has an unsecured claim entitling it to vote with any other class 3 unsecured claim.

The issue thus presented is whether the debtor can force an undersecured creditor who has not made a § 1111(b)(2) election to nevertheless be treated as fully secured

and thereby defeat the creditor's ability to vote the undersecured portion of its claim with other unsecured and impaired creditors.[12]

Apparently recognizing that it cannot classify Potomac's unsecured deficiency claim in a separate unsecured creditor class, *Travelers Ins. Co. v. Bryson Properties XVIII* (*In re Bryson Properties XVIII*), 961 F.2d 496 (4th Cir.1992), the debtor's plan puts Potomac's entire claim in class 2 and would "force" Potomac to accept treatment as a fully secured creditor. While this proposed treatment may at first appear magnanimous on the debtor's part it violates 11 U.S.C. § 506(a) and § 1111(b). The practical effect is to vitiate Potomac's rights of suffrage as an unsecured creditor and foster a "cram down." *See In re 266 Washington Associates,* 141 B.R. 275, 285 (Bankr.E.D.N.Y.1992), *aff'd*, 147 B.R. 827, 830 (E.D.N.Y.1992); *In re Channel Realty Associates*, 142 B.R. 597, 600 (Bankr. D.Mass.1992).

Section 506(a) entitles a secured creditor to an unsecured claim to the extent the claim is undersecured. Moreover, the plain language of § 1111(b) suggests the choice of whether a secured claim will be treated as fully secured or split into secured and unsecured components belongs entirely to the creditor. *In re B & B West 164th Street Corp.*, 147 B.R. 832, 838 (Bankr. E.D.N.Y.1992); *In re 266 Washington Associates*, 141 B.R. 275, 285 (Bankr.E.D.N.Y. 1992), *aff'd*, 147 B.R. 827, 830 (E.D.N.Y. 1992). The choices available to a secured creditor under § 1111(b) surely include a statutory option to employ an unsecured deficiency claim to have a significant voice in and, if its claim is large enough, dominate the unsecured class so that it can avoid the genre of tactical classification scheme being used in this case to silence Potomac. *In re 266 Washington Associ-*

---

secured claim. Such a result would be contrary to the spirit and policy of the Code, which contemplates the protection of secured interests in property and that debtors should have a reasonable period of time to reorganize.

*In re Vermont Investment Limited Partnership,* 142 B.R. 571, 574 (Bankr.D.C.1992).

**12.** Bankruptcy Rule 3018(d) states:

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim shall be entitled to accept or reject a plan in both capacities.

*ates,* 141 B.R. 275, 285 (Bankr.E.D.N.Y. 1992), *aff'd,* 147 B.R. 827, 830 (E.D.N.Y. 1992); *In re 500 Fifth Avenue Associates,* 148 B.R. 1010, 1021 (Bankr.S.D.N.Y.1993); *In re Channel Realty Associates,* 142 B.R. 597, 600 (Bankr.D.Mass.1992).[13]

In essence, the debtor is attempting to "force" Potomac's § 1111(b)(2) election. If the 1111(b)(2) election is to maintain its intended character as a creditor remedy, debtors cannot be permitted to "force" the election against a creditor's interest by artificially classifying their claim as fully secured. In my view such a tactic is not supported by the letter or spirit of section 1111(b)(2).

■ Accordingly, Potomac has an unsecured claim which must be included in class 3, and its negative vote blocks acceptance by class 3. Thus the plan cannot be confirmed as a matter of law because no impaired class has accepted the plan.[14]

*11 U.S.C. § 1129(b).*

■ Before a plan can be "crammed down" over the objection of a dissenting creditor the debtor must establish by clear and convincing evidence that the plan is fair and equitable. 11 U.S.C. 1129(b)(1); *NCNB Texas National Bank v. Hulen Park Place (In re Hulen Park Place),* 130 B.R. 39, 42 (N.D.Tex.1991); *In re Miami Center Associates, Ltd.,* 144 B.R. 937, 940 (Bankr.S.D.Fla.1992); *Imperial Bank v. Tri–Growth Centre City, Ltd. (In re Tri–Growth Centre City, Ltd.),* 136 B.R. 848, 852 (Bankr.D.Or.1992); *In re Future Energy Corp.,* 83 B.R. 470, 481 (Bankr.S.D.Ohio 1988). In this case the debtor has not established that the plan is fair and equitable even by a preponderance of the evidence.

The fair and equitable standard requires that a secured claimholder: (1) retain its lien; and (2) receive deferred cash payments totaling at least the allowed amount of the claimant's secured claim and a present value equal to the value of their collateral. *In re Bryson Properties, XVIII,* 961 F.2d 496, 500 (4th Cir.1992). The concept of "present value" is of paramount importance to an understanding of § 1129(b). Simply stated, "present value" is a term of art for an almost self evident proposition: a dollar in hand today is worth more than a dollar to be received a day, a month or a year hence. *See* 5 Lawrence P. King, Collier on Bankruptcy ¶ 1129.03[4][f][i] (15th ed. 1993). This concept may also be expressed by a corollary proposition: a dollar in hand today is worth exactly the same as (1) a dollar to be received a day, a month or a year hence *plus (2) the rate of interest which the dollar would earn if invested at an appropriate interest rate.* *See* 5 Lawrence P. King, Collier on Bankruptcy ¶ 1129.03[4][f][i] (15th ed. 1993) (emphasis added).

■ The deferred payment of an obligation under a chapter 11 plan of reorganization is essentially a coerced loan and the rate of return with respect to such loan must correspond to the rate which would be charged or obtained by the creditor making a loan to a third party with similar terms, duration, collateral, and risk. *See* 5 Lawrence P. King, Collier on Bankruptcy

**13.** The court recognizes that the legislative history of § 1111(b) suggests it was enacted to prevent cash out at a low appraised value and remedy the inequitable result reached in *In re Pine Gate Associates, Ltd.,* 2 B.C.D. 1478 (Bankr. N.D.Ga.1976). *See* William L. Norton, Jr., Annual Survey of Bankruptcy Law 508–09 (1993–1994). However, the negative implication of § 1111(b) is clear that the "election" is a creditor's remedy and is not for the debtor to make. *In re 266 Washington Associates,* 141 B.R. 275, 285 (Bankr.E.D.N.Y.1992), *aff'd,* 147 B.R. 827, 830 (E.D.N.Y.1992); *In re Channel Realty Associates,* 142 B.R. 597, 600 (Bankr.D.Mass.1992).

**14.** Debtor also argues that because Potomac has never filed a proof of claim for its unsecured claim it has waived any voting rights. This argument is without merit.

Debtor scheduled the appropriate principal amount of Potomac's claim, and did not schedule it as disputed, contingent, or unliquidated. Accordingly, Potomac's claim is presumed valid, *see* Bankruptcy Rule 3003(b)(1), and Potomac is deemed to have filed a proof of claim pursuant to 11 U.S.C. § 1111(a).

The only disagreement between the parties is whether and to what extent Potomac's claim is properly classified as unsecured pursuant to 11 U.S.C. § 506, which in this case was an issue for confirmation.

¶ 1129.03[4][f][i] (15th ed. 1993) (emphasis added). Therefore, the appropriate discount rate used to calculate present value must be determined by reference to the "market" interest rate for a loan of like terms, with due consideration for the quality of the collateral and the risk of subsequent default. *See In re Bryson Properties, XVIII*, 961 F.2d 496, 500–01 n. 4 (4th Cir.1992) [15]

Debtor's plan here essentially proposes a "coerced" loan by Potomac on the following terms:

**15.** The Fourth Circuit most recently addressed the issue of the appropriate method for calculating interest rates in the context of a chapter 13 "cram down." *United Carolina Bank v. Hall (In re Hall )*, 993 F.2d 1126, 1130 (4th Cir.1993). In *In re Hall* the Fourth Circuit stated:

[W]e conclude that it is fairer to treat the value of the collateral retained by the debtor under the "cram down" provision of Chapter 13 as a new loan and to match its rate of return to the secured creditor with that which the creditor would otherwise be able to obtain in its lending market.

*United Carolina Bank v. Hall (In re Hall )*, 993 F.2d 1126, 1130 (4th Cir.1993).

Accordingly, the law in the Fourth Circuit appears to clearly adopt the "market rate" approach. *See also Hardzog v. Federal Land Bank of Wichita (In re Hardzog )*, 901 F.2d 858, 860 (10th Cir.1990); *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427, 431 (6th Cir.1982); *Dominion Bank v. Cassell (In re Cassell )*, 119 B.R. 89, 93 (W.D.Va.1990); *In re Ropt Limited Partnership,* 152 B.R. 406 (Bankr.D.Mass.1993); *In re Eastland Partners Ltd. Partnership,* 149 B.R. 105, 106–07 (Bankr.E.D.Mich.1992); *In re Coventry Commons Associates,* 149 B.R. 109, 111–12 (Bankr.E.D.Mich.1992); *Bruce Energy Centre Limited v. Orfa Corp. of America (In re Orfa Corp. of Philadelphia )*, 129 B.R. 404, 420–21 (Bankr.E.D.Pa.1991); *In re Memphis Partners, L.P.,* 99 B.R. 385, 386 (Bankr.M.D.Tenn.1989); *In re McCombs Properties VIII, Ltd.,* 91 B.R. 907, 912 (Bankr.C.D.Cal.1988); *In re Milspec, Inc.,* 82 B.R. 811, 820 (Bankr.E.D.Va.1988); *In re Edgewater Motel, Inc.,* 85 B.R. 989, 997 (Bankr. E.D.Tenn.1988); Jack Friedman, *What Courts do to Secured Creditors in Chapter 11 Cram Down,* 14 Cardozo L.Rev. 1495, 1512–22 (1993); *but see United States v. Doud (In re Doud )*, 869 F.2d 1144, 1145 (8th Cir.1989); *United States v. Arnold,* 878 F.2d 925 (6th Cir.1989); *In re Ivey,* 147 B.R. 109 (M.D.N.C.1992); *In re Oaks Partners, Ltd.,* 135 B.R. 440 (Bank.N.D.Ga.1991); *In re Computer Optics, Inc.,* 126 B.R. 664 (Bankr. D.N.H.1991); *In re Mellema,* 124 B.R. 103 (Bankr.D.Colo.1991).

This allows a debtor to do more than simply cure defaults and reinstate loans. The debtor may extend payments beyond the original matu-

(1) 100 percent loan-to-value ratio;

(2) 8.25 percent fixed interest rate;

(3) 7–year term with balloon in seventh year; and a

(4) 30–year amortization schedule.

█ Potomac's expert testified there is currently no actual market for a loan on these terms. However, this does not end the inquiry. If there were an actual market the debtor could access to obtain such a loan, § 1129(b)(2) would not be needed. To deny confirmation because there is no actu-

rity date. Further, present value calculations use a market rather than contract rate of interest. This is a boon to debtors who originally borrowed at a time of high interest rates. Conversely, for debtors who previously paid interest at a low rate, it represents a cost of extending the loan's maturity date. *See* 3 David G. Epstein, *et al.,* Bankruptcy § 10–20 (West 1992).

"Discount rate" and "interest rate" are essentially interchangeable terms. The discount rate is the rate of return which equals the sum of the real rate of return anticipated in the investment, plus a change in value and any risk premiums associated with the specific investment when compared to alternative investments. It is the average annual rate of return necessary to attract capital based upon the overall investment characteristics. *See* Potomac's Exhibit 22, p. 37.

Since the discount rate is more of an investor attitude than a mathematically derived number, it is necessary to interpret the expectations of market participants. Discount rates are largely a function of perceived risks. Risk is a function of general economic conditions and characteristics of the particular investment. The critical elements of an investment include the quantity and certainty of income, operating expenses and resulting net operating income over some future time period. Value is a reflection of future income expectations, and the value derived must account for the level of risk achieving future operational results. *See* Potomac's Exhibit 22, p. 38.

The typical apartment investor will be influenced by the subject's location, historical operation levels, contract and market rental rates, vacancies and expenses, the balance between supply and demand, the quality and age of the improvements and general conditions in the subject's competitive area.

Although apartments are being sought after by regional investors, the instant debtor's apartment project would rank low on the scale of desirability because of locational characteristics, past operating history, construction quality and lack of amenities. In the final analysis, it is believed that the subject represents a relatively risky investment demanding a higher than average discount rate. *See* Potomac's Exhibit 22, p. 38.

al market for a similar loan would in effect be giving the market permission to repeal § 1129(b)(2). The court cannot conclude that Congress intended for 11 U.S.C. § 1129(b)(2) to be interpreted such that it never applies. *In re Eastland Partners Ltd. Partnership*, 149 B.R. 105, 106 (Bankr.E.D.Mich.1992). Therefore, the court's inquiry must focus on a hypothetical market rate of interest for a loan of similar terms. This was the focus of the expert testimony presented by Potomac.

■ Potomac's expert witness analyzed the debtor's proposal from a hypothetical refinancing perspective. He concluded from the 7–year term at a fixed interest rate of 8.25 percent that it was better to analyze the proposal from a refinancing perspective rather than a restructuring perspective. I agree with Potomac that its evidence was more germane to the issue before the court than that presented by the debtor.[16]

To construct a hypothetical market rate of interest the witness broke the proposed loan into two components using the "Mortgage–Equity/Band of Investment Analysis:" (1) a 70 percent first priority debt component, and (2) a 30 percent second priority equity component. This was done to provide a market comparison because lenders typically do not make loans of 100 percent loan-to-value.

The witness concluded that a securitization company or a Wall Street Investment Pool may be willing to make a loan on the property of 70 percent loan-to-value; moreover, if a sufficient rate of return was offered the remaining 30 percent component could be completed by individual investors in the market. The effective interest rate on the 70 percent debt component would be approximately 8.66 percent, and the interest rate on the 30 percent equity component would be approximately 14 percent. By blending these rates Potomac's witness concluded that a hypothetical market rate of interest on the debtor's proposal would be approximately 10.74 percent.[17] The court finds the analysis of Potomac's expert probative and concludes that 11 U.S.C. § 1129(b)(2)(A)(i)(II) requires at least a 10 percent rate of interest be paid on Potomac's claim to satisfy the fair and equitable standard of section 1129(b) and "cram down" the plan over Potomac's objection.

Accordingly, debtor's proposal to pay an 8.25 percent interest rate is not fair and equitable, and confirmation of the plan must be denied under § 1129(b).

A separate order will be entered.

### *Appendix A*

Debtor's interest rate expert witness, an officer of a Norfolk bank who specializes in restructuring troubled loans, testified that an 8.25 percent interest rate was at or above the current rate for restructured loans with his bank. According to the witness, he had been involved with several recent restructurings of loans on income producing properties where the bank agreed to an interest rate as low as 5.5 to 7.5 percent.[18]

The witness acknowledged that all these restructurings had a one-year call on the

---

**16.** In my view the debtor's interest rate expert was not helpful in deriving an appropriate "market rate" of interest for a loan of like terms.

Debtor's expert focused on restructuring not refinancing. His own testimony revealed that restructuring does not involve a market analysis. To the contrary, restructuring is driven strictly by what the cash flow of the particular property will carry. He testified that his bank was recently involved in restructuring several loans where the bank accepted an interest rate as low as 5.5–7.5 percent. However, these rates are annually adjusted based upon what the cash flow of the particular properties can carry. In sum, this approach seems to be immaterial to the issue before the court.

**17.** Debtor's appraiser also applied the "Mortgage–Equity/Band of Investment Analysis" in deriving an appropriate rate at which to "discount" or "capitalize" the projected cash flow of the property. His appraisal states that a 10.80 percent interest rate is appropriate on the 70 percent component and that a 12.03 percent interest rate is appropriate on the 30 percent component. *See* Debtor's Exhibit 28, p. 30. Under this analysis the blended interest rate would be approximately 11.17 percent, which is actually higher than Potomac's suggested market rate.

**18.** Several of these restructured loans were on property owned by entities with the same principals as the debtor. In fact, this bank has a long standing relationship with the debtor's principals on several different projects.

interest rate. This allows the bank to raise the interest rate to absorb any increases in cash flow over time. In essence, the rate of interest with a restructuring is "driven into," or "backed into" the cash flow of the particular property and is not determined by the value of the property or market conditions.

Debtor's witness also admitted that restructuring a loan is different from refinancing a loan. With a restructuring the cash flow of the property dictates the interest rate, and typically a bank does not reappraise the property. When refinancing, a bank typically obtains a new appraisal on the property, and the interest rate is determined less by cash flow and more by loan-to-value ratio [19] and risk of default. The witness stated that in many circumstances foreclosing on property is an unattractive remedy for federally regulated financial institutions. When a regulated institution forecloses on property it becomes Real Estate Owned ("REO") and is classified in a manner that may negatively affect minimum capital requirements. If an institution fails to maintain minimum capital requirements the Resolution Trust Corporation ("RTC") or the Office of Thrift Supervision ("OTS") may force the institution into receivership. Therefore, a regulated financial institution, unlike Potomac, may have strong incentives unrelated to market conditions to restructure a loan rather than foreclose on collateral.

Potomac's interest rate expert witness, also an employee of a large bank, testified that a hypothetical market rate of interest on a loan with terms as proposed under the debtor's chapter 11 plan would be 10.74 percent. The witness viewed the plan from a refinancing perspective since the plan proposes a 7–year fixed interest rate, as opposed to an annually adjusted interest rate typical with restructuring.

Potomac's witness testified that loan-to-value ratio and risk of default determine the market interest rate in the typical refinancing. He also testified that there is no actual market for loans with 100 percent loan-to-value ratios as proposed under the plan.[20] Therefore, his conclusion as to the appropriate market rate of interest was derived from breaking a $2,900,000.00 [21] loan into two hypothetical components under what he referred to as the "Mortgage–Equity/Band of Investment Analysis:" (1) a 70 percent first priority debt component, and (2) a 30 percent second priority equity component.[22]

The witness testified that a life insurance company would probably not be interested in the 70 percent debt component because in his view the debtor's property was inferior.[23] However, a securitization company or

**19.** Loan-to-value ratio is simply the percentage of the value of the property being loaned. For example, a $700,000.00 loan on a property valued at $1,000,000.00 would constitute a 70% loan-to-value ratio.

**20.** Potomac's expert also testified that the proposed 30–year amortization schedule was too aggressive in the current market, and that a shorter time period would more accurately reflect market conditions.

**21.** Potomac's expert assumed the value of the property was $2,900,00.00.

**22.** Debtor's appraiser also used the "Mortgage–Equity/Band of Investment Analysis" to determine an appropriate discount rate to apply to projected cash flow. *See* Debtor's Exhibit 28, p. 30.

**23.** The witness testified that in the industry an inferior property is referred to as having "hair" on it.

In conducting his analysis Potomac's expert reviewed the plan, disclosure statement, debtor's operating statements, rent rolls, Potomac's appraisals, and personally visited the property.

Potomac's expert concluded that because the property was a "phase II" project with poor access and exposure to main thoroughfares that a life insurance company would probably be too risk adverse to invest in the property. This analysis is supported by the Potomac's appraisal:

The subject will, over the long term, find is continually difficult to compete effectively in its submarket due to lack of visibility, relatively small units and fair quality construction. It is essential that repairs are completed when needed and a preventive maintenance program is initiated and maintained. Professional management and marketing are integral to the future success of the apartment community.

*See* Potomac's Exhibit 22, Executive Summary.
Potomac's appraisal goes on to state that:

a Wall Street Investment Pool may be interested in the 70 percent debt component,[24] and the witness concluded that an effective market interest rate on this part of the loan would be 8.66 percent.

The witness stated his opinion that no institutional or corporate lender would be attracted to the remaining 30 percent equity component. This component would have to be sold on the market at a substantial return-on-equity (i.e., higher interest rate) to attract investors. On a quality property an 11 or 12 percent rate of return is required, but on the debtor's inferior property a 14 percent rate of return would be required to attract sufficient investors to complete the entire 30 percent component of the loan.

By blending the interest rates on the two components under the "Mortgage–Equity/Band of Investment Analysis," Potomac's witness concluded that a market rate of interest on a loan with like terms, collateral, and risk, would be approximately 10.74 percent.

Although apartments are being sought after by regional investors, the subject would rank low on the scale of desirability because of locational characteristics, past operations history, construction quality and lack of amenities. In the final analysis, it is believed that the subject represents a relatively risky investment demanding a higher than average discount rate.

**24.** Potomac's expert testified that securitization companies and Wall Street Investment Pools invest up to $100,000,000.00 at a time. Accordingly, these entities are more apt to accept and diversify risk.